ALBERT STEPHENSON & al. *versus* PISCATAQUA FIRE & MARINE INSURANCE CO.

In an action upon a policy of marine insurance stipulating, that in case any dispute shall arise in relation to any alleged loss, it shall be referred to and determined by referees to be mutually chosen by the parties; that no policy holder shall maintain any action thereon until he shall have offered to submit his claim to such reference; and that in case any suit shall be commenced without such offer, the claim shall be released and discharged, and the company exempted from all liability under it; — *Held,* such stipulations are void.

Such a policy, causing " S. & Co. to be insured, for whom it concerns, in the sum of $700, on schooner 'Arbutus,' of," &c., " at and from," &c., " the above to cover their claim for supplies furnished said vessel;" — *Held,*
1. That the policy does not apply to the supplies only; and
2. That any conversation between the owner and the plaintiffs tending to show authority from the former to the latter to take out this policy is admissible.

And when the policy provides that the defendant company is, in case of prior insurance, answerable only for so much as the amount of such prior insurance may be deficient towards fully covering the property at risk; — *Held,* that the jury, if they found for the plaintiffs, should ascertain the value of the schooner at the time of the loss; and, if they should find the whole amount of insurance did not exceed such value, and the loss a total loss, they might assess as damages the amount insured by the defendants with interest from the time it was payable.

In case of a sale from necessity by the master, the salvage belongs to the insurers; and the assured is entitled to recover the full amount of his claim, irrespective of the amount of salvage received by the insurers.

An alleged copy of a survey, not made by order of a court of admiralty or under the sanction of an oath, is not admissible in evidence, though certified and stamped by the American consul at the port where the survey was made.

No exception lies to the refusal of the presiding Judge to order a nonsuit.

A policy of marine insurance covers not only losses that result from injuries caused by extraordinary perils of the sea which become immediately known, but such also as result from latent injuries.

The authority of a master to sell the vessel and cargo in case of marine disaster, rests exclusively upon the ground of necessity, the burden being upon the assured.

What will not constitute the requisite moral necessity.

ON EXCEPTIONS and motion to set aside the verdict as be-

ing against law, and manifestly against the weight of evidence.

ASSUMPSIT on a policy of insurance, dated Dec. 16, 1861, causing "Stephenson & Co. * * to be insured * * for whom it concerns, loss, if any, payable to Stephenson & Co., in the sum of seven hundred dollars, on schooner ' Arbutus' of," &c., " at and from Portland, Me., to Cardenas, and at and from thence back to a port of discharge in the United States. The above is to cover their claim for supplies furnished said vessel." The policy also contained the following among other stipulations : —

"It is hereby agreed that, if the insured shall have made any other insurance upon the schooner aforesaid, prior in date to this policy, then the said insurance company shall be answerable only for so much as the amount of such prior insurance may be deficient towards fully covering the property at risk, whether for the whole voyage, or from one port of lading or discharge to another," &c. * * * "Property insured by this company, and damaged so that the company are liable, shall not be sold without the consent of the company, unless positive proof can be produced that a further loss would be sustained by waiting for such advice," &c. * * * * * * * * * * * * * *

"In case any difference or dispute shall arise in relation to any loss sustained, or alleged to be sustained, by any person insured under a policy issued by this Company, the same shall be referred to, and determined by referees, to be chosen mutually by the assured and the Board of Directors ; said referees to be governed by the rules and customs of insurance in Boston, when not conflicting with the terms of the policy ; and no holder of a policy shall be entitled to maintain any action thereon against the company, until he shall have offered to submit his claim to such reference. In case any suit shall be commenced without such offer of reference having been made, the claim of the party so commencing such suit shall be released and discharged, and the company be exempted from all liability under it."

*Albert Stephenson,* called by plaintiffs, testified — " that the firm of Stephenson & Co. consisting of self and Alexander B. Stephenson, were ship-chandlers, in Portland, in 1861; that plaintiffs held mortgage on schooner " Arbutus" to secure the note of Capt. Rogers for $1,199,97, dated June 15, 1861, given for ship-chandlery furnished the " Arbutus;" that they furnished $200 worth of supplies to Capt. Rogers in the fall of 1861; that the witness, in accordance with directions from Rogers, took out this policy, and upon informing him of it on his return, he approved it. [The defendants' counsel seasonably objected to witness' conversations with Rogers, in the absence of the defendants, but the presiding Judge admitted all such conversations tending to show authority to effect the insurance.] He further testified that Stephenson & Co.'s note did not include the $200 for supplies, and that the other policies, amounting in all to $4000, run to Stephenson & Co. " for whom it concerns."

*James C. Rogers,* called by plaintiffs, testified : — " I have been a mariner for twenty-five years, and for over twenty years have been a master of most all kinds of vessels, from seventy-five to six hundred tons burthen. I built the " Arbutus," and launched her in 1861. I first got her to sea in August, 1861. Went, in December, 1861, to Cardenas. Schooner was in good order, to all appearance. She carried box-shooks, and had a crew of five, all told. We were thirty days on the passage. The usual time is from fifteen to thirty days. Twenty days is a fair passage. This was the roughest passage I ever made. The deck load was well secured when I left, and was lost on the trip, and the mate was washed overboard. It was seventeen days after sailing before we got into pleasant weather. There was a complete gale of wind all that time. We arrived at Cardenas January 15 or 16, discharged cargo, and sailed on our return February 17 or 18. We were in Cardenas about thirty days. The vessel was there painted two coats, and the decks were tarred. I put on new tarpaulins and took such

care of vessel as was usual. Tried the pumps twice a day, and found little or no water. I discovered no leaks or defects while in port, and nothing needing more repairs than I made. Schooner sailed from Cardenas loaded with molasses and honey — bound for Boston. She was loaded by a merchant named Parravicine, who owned cargo. I had $1,000 insurance on her, and then knew of no other. I had not been informed of any other. Had conversed with Stephenson before I left about insuring her. He had not informed me of any. Had a crew of five on our return. Left Cardenas at 5, A. M. Fair wind. Had a pilot out, who left us near Stone Key, about eighteen or twenty miles from our anchorage, between 10 and 11, A. M. I was on deck till after pilot left, and then went to cabin to shift my clothes. All the others were on deck. I was in cabin about twenty minutes. I went down about eleven o'clock, and we were then a mile or two from Stone Key. I went on deck then, as the pump did not suck, and I was somewhat alarmed. I never was below again. The pump worked, but didn't suck dry. There was still water in her. After working both pumps thirty minutes I found eighteen inches of water in the hold. In half or three-quarters of an hour I sounded again and found two feet of water. We still kept on our course, and in one hour I found two feet and eight inches of water in her. Both pumps were going all the time. The vessel, when I went to sea, drew nine and a half feet. I hove her round then, a little after two, P. M., about fifteen miles from Stone Key, and tried to get back to Cardenas. We were thirty-five or forty miles from Cardenas when I hove round. She was then crank, and water was pretty near up to decks. Was quite rough. Headed her to get back to Stone Key, but found it was no use, she made so much leeway and slow at that. We run on that course about three-quarters of an hour. Nearest land was about ten miles east of Stone Key. Then put her on the other tack to get into smooth water under the islands. Run on that course about two hours, and struck on a shoal. When I found her in shoal water I haul-

ed her round on the other tack. She run five or ten minutes and struck, and stuck fast. The tide rises some twelve to eighteen inches. Set signals of distress. When waves left her, and when they returned, she rolled under water up to her hatches. I remained there till dusk—about an hour and a half. Were some small vessels in sight, eight or ten miles off; none came up to us. When schooner rolled down, water came almost to the hatches. None of the cargo started. I and the crew left at sunset. Had one boat. We took it and rowed to Stone Key. I applied for assistance but it was refused. Then we left for Cardenas, and arrived there about four, A. M.,—about daylight. I went aboard a brig, when I got to Cardenas, stayed there till light; went ashore with the captain at about six, A. M. Went first to Parravicine's and called him up. He went with me to the American consul's. We tried to obtain a lighter. I informed the consul. Consul and I went immediately after a lighter, but couldn't find one. They were all engaged. We kept looking for one till 9, A. M. It was necessary to get a permit to take the lighter out. No permits are issued till after 10, A. M. Parravicine went with me for a lighter. I next saw the Arbutus in Cardenas harbor, at noon the same day. Went on board. Pilots were in possession, and there were some half dozen persons aboard. Water was up to decks then. There was three and a half feet or more of water in her, and they were at the pumps all the time. A survey was held on her that same afternoon. The consul took possession of her and called the survey. Captains Collins and Runnells were the surveyors. I noted a protest same afternoon. Vessel was not pumped out before survey, nor discharged, nor the hatches opened. Surveyors could not have examined the bottom of the vessel. Saw no holes below water's edge. Plug was not driven in, but was out about four inches. It was an old pine plug. First saw it after the survey. I have no knowledge of any holes being bored in the vessel after she left Portland. The holes in the ceiling did not occasion the loss of the vessel. The plug which was in the hole was

a little over half an inch in diameter.  That hole, if open, would not have admitted one-eighth as much water as the pumps would have discharged.  I saw no other hole in the outer planking.  Those who brought the Arbutus in claimed of the consul and myself one-third, as salvage.  I took advice as to the claim, from merchants and ship-masters. It was a valid claim, and was allowed by the consul and myself.  There was no chance to repair the vessel in Cardenas, or to heave her down.  There was no dock.  In some places we could have got her within a quarter of a mile of the shore.  There were no facilities for discharging, which had to be done with lighters.  It would have cost twice its value to have discharged cargo and stored it.  I had no funds, and raised none on vessel, and had no funds at home to draw on.  I attempted to raise funds with Parravicine, and all the principal merchants, on bottomry. Consul went with me.  I got no funds.  Advertised for bottomry.  Finding I couldn't obtain funds, I advertised the vessel and sold her at auction, the consul acting as auctioneer.  She was sold for $2,100, on February 28.  The cargo was sold and reshipped to another vessel.  I could have repaired vessel at Havana, but it would have cost too much.  I did not communicate with defendants before the sale.  I didn't think it was necessary, and didn't communicate with Ocean Insurance Co.  The salvage was settled by the consul and myself, for one-third of the proceeds of the sale.  The remainder was sent by the consul to the Alliance Insurance Co., contrary to my orders.  I took the advice of the consul.  When I left, the consul's bill was $56."

*On cross-examination,* testified :—" I am fifty-three years old, and have always lived in Freeport—have been to the West Indies a dozen voyages — have not been to sea since the Arbutus was lost.  I arrived here in March, 1862, on my return from Cardenas.  I have not tried to get a vessel since, but have been farming.  Am not interested in any other vessel.  Have been ship-master off and on for thirty years.  The Arbutus was ready for sea at Cardenas.  Cargo

all in on Friday afternoon, I think, and sailed on Tuesday, February 18. I laid there one day, to get provisions and clear the vessel. We tried the pumps twice a day, and they always sucked. When I sailed from Cardenas there was only $1,000 insurance on vessel, to my knowledge. I requested plaintiffs to get other insurance on her. When I sailed from Portland she was worth $5,600. $1,000 was all the insurance I thought necessary, as I was going in her myself. I probably owed $2,000 besides what I owed Stephenson & Co. We tried the pumps the morning we left Cardenas and they sucked. One pump was rigged and tried, and drew water before I went below. There was not more than five or ten minutes pumping before I went below. I went down to the cabin and did not go into the forecastle, at all, the day we left Cardenas. About half an hour after I returned to the deck I sounded the pumps. I had about twenty hogsheads as deck load but not a full deck load, as she was loaded by the head. Hatches were well secured. February 18 was Tuesday, and I sailed from Cardenas on that day. I sent the man down into the forecastle to see what was the cause of the leak. Before I left Cardenas for sea, the decks were fourteen inches above the level of the water. I sent men down to bring up the gear of the other pump. They couldn't discover leak—every thing seemed to be all right. Between the top of upper tier of casks and the deck was about six inches or a foot. There was not room enough to get through and examine."

Witness produced log book.

"I took this book from schooner when I left her and went to Cardenas. The mate got it from below. I did not go down into the hold, at all, after the schooner began to make water. I could not get in. A plank partition separated the hold from the forecastle. Some of the planks were off. The space left between the hogsheads and the beams was not over eight inches. I helped stow the cargo. Had no mate at Cardenas. I gave my bill of lading to the Consul at Cardenas to send all the papers to the Ocean In-

surance Company. I remained in Cardenas twelve or fifteen days after returning there, and then came to Portland. I left the schooner to get assistance. Left no one on board. I don't suppose I had over 125 hogsheads on board. To the best of my recollection there were 125 or 130 hogsheads. After the schooner struck I tried to back her off by her sails. That was all I could do. At 11, A. M., next day, (Feb. 19,) I saw the Arbutus coming into Cardenas. She came in under her own sail. I had left her thirty-five or forty miles from Cardenas, at about 6, P. M., and arrived at Cardenas at 4, A. M. Was in my boat all that time except three-quarters of an hour on board the Alliance, where I got rested. I went on board the Arbutus at 3, P. M., that day. She was lying within a quarter of a mile of the wharves. I entered a protest — all the men went with me to make it."

Witness identified copy of protest.

" I had a survey called. Collins and Runnels were the surveyors. *I have no doubt* that the paper now shown to me is a copy of the report of surveyors. I went on board the Arbutus and stayed till night. I wanted the crew to go off with me and was thinking of buying her in. I was looking around the vessel. There was nothing out of shape about her. I was aboard the next day. Those who had brought her in had left her after plundering her. They took all my provisions and clothing. I went on board every day until she was sold, on February 28 or 29. There was no opportunity to repair her at Cardenas. They don't repair vessel's bottoms at Cardenas. I was in Cardenas once, ten or twelve years ago. I applied to James M. Churchill, and talked with him personally, and with others, and attempted to have the Arbutus repaired. They all told me that she could not be repaired there. The cargo could not have been discharged. There was no chance to land or store it. The shore was all occupied. Can't tell what it would have cost to have landed it, but we calculated that it would have eaten up its value, and twice as much more. It

would have cost $2 per cask to have landed it on the shore. I think there was a mail between Cardenas and New York once a fortnight. In selling the vessel at Cardenas I acted for all concerned. Had there been a chance it could have been stored in the city. Would have cost $5 per cask to have landed and stored it."

Defendant moved for a nonsuit, on the ground that the policy, by its terms, applied only to Stephenson & Co.'s claim for supplies — which was not an insurable interest — and also because the plaintiffs had not, before bringing suit, offered to refer the claim as required by conditions of policy.

But the presiding Judge *ruled that action was maintainable,* and refused to order a nonsuit.

*James M. Churchill,* called by defendants, testified : — "I have been a merchant at Cardenas from 1847 to May, 1865. The Arbutus was consigned to me in 1861. I did not load her. I saw her several times after she was brought into Cardenas, after being ashore. It was very easy to land the cargo. It would have cost seventy-five cents a cask to have landed it. A vessel having holes in her bottom, in the second wale, twelve or fifteen feet from her stem, could easily have been repaired at Cardenas. It is usual there to heave vessels down to examine their bottoms. There would have been no trouble in heaving down the Arbutus. I think there would have been no difficulty in heaving her down by any of the wharves in Cardenas. Facilities for repairing would depend on what was to be done."

*On cross examination,* testified : — "The crop season in Cuba lasts six months — from Christmas to May or June. It is the constant custom to repair coasters of from 60 to 175 tons burthen, by heaving them down, in Cardenas. She could not be hove down till discharged. Could not have been beached."

The defendants read in evidence a duly certified copy of the protest made by the captain at Cardenas.

The defendants offered in evidence a copy of the appointment of surveyors by the consul at Cardenas, and of the

report of the survey called by the captain at Cardenas, said copy being duly certified by the American consul under his official seal, and the same paper referred to by the captain in his testimony, which was objected to by plaintiffs and excluded by the Court.

The defendants read, in evidence, the account of sales of schooner Arbutus and cargo, at Cardenas.

The Court instructed the jury, among other things not excepted to, that the policy authorized plaintiffs to show by parol evidence who were "the concerned;" that, if plaintiffs effected the insurance for the owner and master, and the owner and master ratified it, plaintiffs are entitled to recover, if no other objection; that during a voyage the insured must keep a vessel in suitable condition for the voyage and business. If he does not, and a loss occurs by his failure to do so, the insurers are discharged; if vessel becomes unseaworthy, he must repair, if he has reason to suppose her unseaworthy—he must use ordinary care in keeping himself acquainted with the condition of the vessel. That, to justify a sale of a vessel by a master, there must be an absolute and extreme necessity; that jury will determine whether, in this case, there was such an extreme necessity, and whether captain acted with good faith, judgment and discretion — if so, the sale was authorized, and constituted a constructive, total loss; that the whole amount of insurance upon the vessel was $4,700, and, if jury find vessel to have been worth $4,700, the plaintiffs are entitled to recover the $700 insured by this policy, with interest from the time it was payable.

The defendants requested the Court to instruct the jury that the policy declared upon, by its terms, applies only to the claim of Stephenson & Co., for supplies furnished the schooner Arbutus; that, upon the testimony in the case, there is no sufficient evidence that the vessel was damaged by any of the perils insured against; that, if the jury find that there was a constructive total loss, the amount of the vessel's proportion of the salvage is to be deducted from the

amount of the loss; that the defendants are liable for only so much of the loss, (not exceeding $700,) either total or partial, as is not covered by the prior insurance in the Pacific and Ocean offices, to the amount of $3,000, after deducting the vessel's proportion of the salvage; that, by the terms and conditions of the policy, no action can be maintained thereon without a previous offer to refer the claim to referees, to be chosen mutually by the assured and the directors of defendant corporation.

All which requested instructions the Court declined to give. But the Court did instruct the jury, that by the terms of this policy it was agreed that, if the assured shall have made any other insurance upon the schooner prior in date to this policy, then this insurance company should be answerable only for so much as the amount of such prior insurance may be deficient towards fully covering the property at risk, and that they would therefore ascertain the value of the schooner at the time of the loss, and with the proofs in the case assess the damage upon this rule established by the parties, if they should find for the plaintiffs; and that, if they should find the whole amount of insurance upon the schooner did not exceed $4,700, and that she was worth that sum when she was lost, if the loss was a total loss, they would assess the damages at $700, and would be authorized to add to this sum by way of damage, if they found the plaintiffs suffered it, a sum equal to lawful interest on the $700 from the time the loss was payable, by the terms of the policy, which was in 60 days after proof and adjustment of loss, to the present time.

The jury returned a verdict for plaintiffs for $780,50, which defendants moved be set aside.

And to the foregoing rulings and instructions, and refusal to instruct, the defendants excepted.

*J. & E. M. Rand*, for defendants.

Verdict for plaintiff for total loss is not warranted by the evidence, and should be set aside.

Schooner built in Aug., 1861,— a first class, hard wood vessel—sailed in Dec., 1861, —arrived at Cardenas Jan. 15, having sustained no damage on the voyage — sailed from Cardenas for Boston, with molasses, Feb. 18, at 6, A. M.— After passing Light found the vessel settling,—tacked ship to return, but run her ashore and abandoned her, and captain and crew arrived at Cardenas in boat at 4, A. M. of Feb. 19—the pilots found the vessel derelict, and brought her into Cardenas before noon, of Feb. 19. The master then sold vessel at public auction without communicating with insurers.

Vessel met with no stress of weather, or accident of any kind, but without any apparent cause, begins to fill when only a short distance from port and by the time she reached the light. She had been fully loaded from Friday afternoon to Tuesday morning, and had not leaked any of any consequence, as pumps always sucked,—and pumps sucked the morning they sailed.

It was the duty of the owner to have the vessel seaworthy when she sailed, and yet it is apparent from facts that she could not have been so, for, without sustaining any injury of any kind, she fills with water. Now, if this filling with water led to a constructive total loss, the insurers are not liable, because the vessel was not seaworthy, and the verdict should be set aside. *Talcot* v. *Insurance Company*, 2 Johns., 124.

But the filling with water was neither an actual nor constructive total loss, it did not destroy nor materially injure the vessel; she is in a few hours brought back to Cardenas and anchored in port.

What authority then had the captain to sell, and turn a trifling, (if any,) partial loss into a constructive total loss? True, there was a claim for salvage, but that gave no authority to sell without communicating with insurers, when such communication was practicable within a reasonable time. And certainly, in this case, he had no authority to sell without consulting insurers, as it was expressly stipulated in the policy that property insured and damaged should

not be sold "without consent of the company, unless," &c. And there is no such proof.

These are well settled elementary principles to be found in the text books. And how can it be pretended that there was a total loss, even constructive, of the schooner by the perils of the sea? And how can the verdict be sustained?

Had the vessel been damaged and needed repairs, the Court will perceive, by the testimony of Churchill, that she could have been repaired at Cardenas. And, if the captain had no funds, he should have raised some or communicated with insurers before sale.

But the captain says "there was nothing out of shape about her. I was thinking of buying her in." Selling and buying her in! Could not raise money to pay salvage or to repair, but could raise money to "buy her in."

The whole transaction and the whole evidence shows that the company should not have been held liable for a total loss, and the verdict was not warranted and should be set aside. *Robinson* v. *Gorges Insurance Co.,* 17 Maine, 131; *Hale* v. *Franklin Insurance Co.,* 9 Pick., 466; *Stephenson* v. *Pacific Insurance Co.,* 7 Allen, 232.

Salvage on the vessel was $1125,31, and yet no notice was taken of this by the Court or by the jury.

The master (and owner) should have received the salvage on the vessel, as there was no abandonment, and the amount should have been deducted in determining the amount for which the insurers were liable. The master allowed it to be taken by the consul and no part came to the defendants. Under such circumstances the plaintiff is to be charged with it, and it is to be deducted. 2 Phil. on Ins., § 1714, 1798.

There was no abandonment, and if, (as defendants contend,) the sale was not justifiable, abandonment was necessary in order to recover for a total loss.

The conversations between the plaintiffs and Rogers, respecting insurance, were not admissible in evidence, even upon the principle on which the Court admitted them, because they did not tend to show an authority to insure.

But the policy, by its terms, applied only to Stephenson's bill for $200, of supplies. The defendants caused Stephenson & Co. "to be insured, for whom it concerns, loss, (if any,) payable to Stephenson & Co." The policy then declares that "the above is to cover their claim for supplies furnished said vessel;" meaning, of course, that the above insurance or policy is to cover their claim for supplies.

The Arbutus being a domestic vessel, Stephenson had no lien for supplies, and consequently had no insurable interest. The policy was void, and the nonsuit moved for by defendants should have been ordered.

But, even if the policy could be held to have attached, it covered only Stephenson's claim.

A policy in the name of A, "for whom it concerns," will be applied to the interest of the party only for whom it was intended. 1 Phil. on Ins., 213, 214. The intention of the party ordering the policy determines who are the "concerned." 1 Arnold on Ins., 170, note 2. And certainly, when the policy itself declares what it is intended to cover and who are the "concerned," the policy is conclusive upon this point, and the instruction of the Court, that plaintiffs might show by parol who were "the concerned," was erroneous; it allowed plaintiffs, by parol evidence, to vary and contradict the plain words of the policy.

Can anything be plainer as to the intention of the parties, who and what they insured, than the words of the policy? And on what principle is it varied by parol? The policy covered only Stephenson's claim for supplies. Had it been intended to cover anything more and only to pay Stephenson his bill out of the amount received for Rogers, and upon Rogers' interest, different words would have been used.

Under the instruction and ruling of the Court, the words "the above is to cover," &c., are, in legal effect, stricken out of the policy.

The report of the surveyors called by the captain and owner, certified by the American consul, and proved by tes-

timony of the captain, should have been admitted in evidence.

The instructions requested by defendants should have been given upon all the points on which we have given our views.

Upon the facts shown in evidence, it is apparent that gross injustice has been done to the insurance company, by charging them with a total loss, and that, upon the testimony of a master and owner, who, upon his return to the United States, was arrested and almost indicted for wilfully casting his vessel away.

*Evans & Putnam*, for the plaintiffs.

Dickerson, J. — Assumpsit on a policy of marine insurance on schooner " Arbutus," of Freeport, Maine, " at and from Portland to Cardenas, and at and from thence back to a port of discharge in the United States." The insurance was effected " for whom it concerns," and the loss made payable to the plaintiffs. The vessel was owned by James C. Rogers, who was also master.

The plaintiffs are met, *in limine*, with the objection that this action cannot be maintained because of their non-compliance with the following clause in the policy : — " In case any difference or dispute shall arise in relation to any loss sustained or alleged to be sustained, by any person insured under a policy issued by this company, the same shall be referred to and determined by referees to be chosen mutually by the assured and the board of directors, * * * and no holder of a policy shall be entitled to maintain any action thereon against the company until he shall have offered to submit his claim to such reference. In case any suit shall be commenced without such offer of reference having been made, the claim of the party so commencing such suit shall be released and discharged, and the company be exempted from all liability under it."

For every breach of a valid contract, the law provides a remedy as a necessary incident of the contract. The law supplies the omission to specify the remedy in the contract

and makes it part and parcel of, and inseparable from it. While parties may impose, as a condition precedent to application to the courts, that they shall first have settled the amount to be recovered by an agreed mode, they cannot entirely close the access to the courts of law. The law and not the contract prescribes the remedy; and parties have no more right to enter into stipulations against a resort to the courts for their remedy, in a given case, than they have to provide a remedy prohibited by law. Such stipulations are repugnant to the rest of the contract and assume to divest courts of their established jurisdiction. As conditions precedent to an appeal to the courts, they are void. *Livingston* v. *Ralli*, 30 Eng. L. & Eq., 279; *Scott* v. *Avery*, 20 Eng. Law & Eq., 336; 36 Eng. Law & Eq., 336; *Nute* v. *Insurance Co.*, 11 Exch., 180, 181.

The policy in the case at bar first gives the plaintiffs a perfect right, and then provides that, in case differences shall arise under it, the whole subject, including both the right to recover and the amount of damages shall be determined by referees. This stipulation does not prescribe a particular mode of ascertaining the damages as preliminary to the commencement of an action, but is purely a condition subsequent to the claim or right, and precedent to the institution of proceedings for its enforcement. It therefore relates to the remedy, and comes within the principles above stated. An offer of the insured to refer is made a condition precedent to bringing an action, while an offer made by them and accepted by the company, makes the referees final judges of the matter in controversy. In either case, the court is divested of its jurisdiction. This clause in the policy, in effect, if not in terms, commands the court to order a nonsuit, if the assured shall presume to bring an action before he has offered to submit his claim to a reference; and such seems to have been the construction put upon this provision of the policy by the learned counsel for the defendants, when he submitted his motion for a nonsuit, though he seems to have waived the point in his

argument. If anything further is needed to illustrate the obvious groundlessness of this motion, it may be found in the manifest impropriety of holding a party to submit to ordinary arbitration the grave and complicated questions of law which arise in this case. The provision in question being repugnant to the rights secured by the contract, and aiming to divest the court of its jurisdiction, is void, as a condition precedent to the maintenance of this action; and the presiding Judge very properly so ruled.

The argument of the learned counsel for the plaintiffs is a conclusive answer to the position taken by the defendants' counsel in his request for instruction, that the policy applied only to the claim for supplies. In terms, the insurance was effected upon, and the valuation made of, the vessel only. The subsequent clause in the policy that "the above is to cover their claim for supplies furnished the vessel," cannot, nor does it purport to change the insurance effected on the vessel by a previous clause, and put it upon the supplies. The loss was obviously made payable to the plaintiffs to enable them to indemnify themselves against the loss of their claim for supplies, and this paragraph was inserted to indicate their authority and purpose to do so. Besides, the supplies only amounted to $200, whereas insurance was effected for $700. The defendants have no cause of complaint that the instructions requested on this point were refused.

By another clause in the policy the company is made "answerable," in case of prior insurance on the vessel, "only for so much as the amount of such prior insurance may be deficient toward fully covering the property at risk." Although this is a valued policy and the value of the vessel is fixed, yet this provision of the policy restricts the right of the plaintiffs to recover the excess of the value of the vessel, when lost, over the amount of the prior insurance, not exceeding $700. In order to give effect to this provision, it became necessary to ascertain the value of the vessel at the time and place of the loss, and there was no

error in so instructing the jury. This is the rule in analogous cases. *Patapsco Ins. Co.* v. *Southgate,* 5 Peters, 490.

The instructions in regard to the amount of prior insurance to be allowed, were given as requested. The requested instruction that, if the jury should find that there was a constructive total loss, the amount of the vessel's portion of the salvage should be deducted from the amount of the loss, was refused. Such salvage in case of abandonment to the underwriters or a sale from necessity by the master belongs to the insurers. It is not the duty of the assured to take part in the litigation which may arise among the several parties who have risks on the property for the due apportionment of the salvage among themselves. The assured is entitled to recover the full amount of his claim irrespective of such apportionment or of the amount of salvage received by the insurers. But for the argument of counsel, it would be difficult to perceive the ground upon which this request is to be placed. It there appears to be based upon the assumption that the plaintiffs have received the salvage belonging to the vessel. In that case the principle contended for would undoubtedly be applicable; but we do not understand that the plaintiffs have ever received any part of the salvage. The sale of the vessel and the remittance of the salvage to the Alliance Company took place without their knowledge, authority or consent. Neither they nor any one over whom they had control, received any part of the salvage. On the contrary, the auctioneer sent the vessel's part of the salvage to the Alliance Company against the remonstrance of the master. The requested instructions were rightfully refused.

The insurance having been effected " for whom it concerned," it was competent for the plaintiffs to show who had the insurable interest, and the authority they had for procuring the insurance. Evidence of statements made by Rogers, the owner, to the plaintiffs, tending to show this, was clearly admissible, as the presiding Judge held it to be.

So, also, the ruling excluding the alleged copy of the report of the surveyors was unobjectionable. The survey was not made by order of a court of admiralty; nor is there any evidence that the surveyors acted under the sanction of an oath. The master had no control over them, nor is he responsible for their acts, declarations or opinions. He had no opportunity to examine them. There is no law or usage recognized by courts by which the certificate of an American consul stamps such a paper with the authority and character of a deposition, or makes a copy equivalent to the original. The assured is not bound to produce the survey, if called for by the underwriters, nor can it be read in defence against his objection. If the defendants would avail themselves of the facts disclosed in the report of the surveyors, they should have taken their depositions or had them present as witnesses at the trial. The rules of law do not invest evidence of this description with special immunities. Neither plaintiff nor defendant can use such a document in evidence without consent of parties. *Hall* v. *Franklin Ins. Co.*, 9 Pick., 466; *Mitchell* v. *New England Mar. Ins. Co.*, 6 Pick., 117; Phillips on Ins., § 2096.

No exception lies to the ruling of a Judge in refusing to order a nonsuit, and the question of seaworthiness was properly submitted to the jury.

In every contract of marine insurance against sea perils, during a certain voyage, the assured impliedly warrants that his vessel is in a suitable condition to proceed on the voyage, and to meet all the common perils and dangers incident thereto with safety. This warranty is a condition precedent to the obligation of insurance; and if, at the inception of the risk, the vessel is lacking in any of the essential requisites of seaworthiness, the policy is void. This rule of law applies, as well where the unseaworthiness is neither known nor could be known to the assured, as where it was known or caused by him. The question of good faith on the part of the assured in this respect is immaterial when the fact of

unseaworthiness is proved. If the vessel is seaworthy at the commencement of the risk, the condition of warranty is fulfilled, though she becomes unfit for sea, and goes to the bottom in twenty-four hours afterwards. But if a ship sails on a voyage, and within a day or two becomes leaky, or founders, or is obliged to return to port without encountering stress of weather or any visible or adequate cause to produce such an effect, the presumption is that she was not seaworthy when she sailed; though no such presumption exists, where it is proved affirmatively that the ship was seaworthy when she left port, and that she encountered perils such as might disable a staunch and well manned vessel. The question whether a ship was seaworthy at the commencement of the risk on a voyage, when not otherwise ascertained, must be decided by rational inference from the circumstances in proof. Her age, the materials of which she was built, the skill and fidelity of her architects, the climatic tests to which she has been subjected, the kind of cargoes she has carried, the nature of the perils she has encountered, and the proximity in time between the inception of the risk and the disaster, for the most part, make up the magazine of facts from which the conclusion as to seaworthiness is to be drawn. The question of seaworthiness is to be determined by the jury. The burden of proof, however, is on the insurer to establish the fact of unseaworthiness, the presumption of law being that the ship was seaworthy. *Treadwell* v. *Union Ins. Co.*, 6 Dow, 273; *Paddock* v. *Franklin Ins. Co.*, 11 Pick., 226; *Watson* v. *Clark*, 1 Dow, 344; *Munroe* v. *Vandam*, 1 Park. Ins., 333; *Parker* v. *Potts*, 3 Dow, 23; *Walsh* v. *Washington Mar. Ins. Co.*, 32 N. Y., 427; *Patrick* v. *Hallett & al.*, 1 Johns., 341; *Talcot* v. *Am. Ins. Co.*, 2 Johns., 124, 467; Arnould on Ins., (Perkins,) § 245.

The theory of the defence is, that the evidence manifestly overcomes both the presumption and the proof of the seaworthiness of the "Arbutus," and also raises the presumption of her unseaworthiness. The principal fact relied upon

in support of this position, is the occurrence of the disaster, in the absence of extraordinary sea perils and all other causes sufficient to produce such an effect, within a few hours after she sailed from Cardenas. This argument would undoubtedly be entitled to grave consideration if the risk commenced at Cardenas; but the risk attached at Portland, some sixty days prior to the disaster. Her seaworthiness, when she sailed from Portland, is not only to be presumed, but it is proved. She had been built only a few months, of hard wood materials, and was pronounced a first class vessel by her architects. This was her second voyage, and there is no evidence that she was damaged on her first voyage, or that she did not then prove to be a sound, tight and staunch vessel. On her outward passage to Cardenas, she experienced rough weather, encountering a "gale of wind for seventeen days," and losing her deckload. This was a peril covered by the policy, and such as might well disable a seaworthy ship. The consideration that the effects of these perils on the "Arbutus" were not discovered at the time she fell in with them, is by no means conclusive proof that she was not injured by them, nor does it absolve the insurers from liability if the final disaster actually arose from this cause. A marine insurance policy covers not only losses that result from injuries caused by extraordinary perils of the sea which are immediately known, but also losses that result from latent injuries. The frowning waves which a ship seems to mock at unharmed, or the storm that she proudly outrides in apparent safety, may give her a death wound; and, though the hour of her dissolution be far distant, and, when it comes, it may be in the very calm that betokens immunity to her faithful mariners, yet her destiny is not the less certain from the remoteness of the injury, nor the damages the less severe in their consequences that they were not apparent at their inception. A bolt may be loosened or a timber started in a storm, without being perceived until the subsequent action of the water, or the climate, or the greater strain of a different cargo has so augmented the injury as to cause the

loss of the vessel. The most skilful, experienced and energetic navigator cannot go into the hold of his ship, and overhaul her cargo to note the effect the storm is producing upon her hull; his presence in such cases is required upon the quarter deck. If the pumps "suck dry" all the while the storm is raging, all below decks is presumed to be well. In numberless instances of marine disasters, from the nature of the case, the injury complained of does not happen simultaneously with the particular peril that caused it. To restrict the insurers' liability to cases where such coincidence occurs, would be to deprive the assured of all remedy in a vast number of cases, where every rational inference points to some previous peril of the sea, as the actual cause of the loss, though the particular effects are not experienced or perceived until a long time thereafter. It is in some degree to remedy this difficulty, that the law arms the assured with the presumption that his ship, in a given case, was seaworthy; and, having proved that she met with perils of the sea adequate to disable a seaworthy ship, and that she has received an injury which such perils ordinarily occasion, he is entitled to recover as for a loss by the perils of the sea, unless the contrary appears, if the jury are satisfied that the damage originated from previous perils.

It was this inference that the jury doubtless drew in regard to the cause of the disaster to the "Arbutus." Nothing happened to her after she sailed from Cardenas to cause her to fill with water so suddenly, unless she had previously sustained some latent injury. Finding that she was seaworthy when she left Portland, the jury would naturally look to the perils of the sea which swept away her deck load on her outward passage, as the cause of her disaster. Her exposure to the climate of Cardenas for thirty days, and the change in her cargo, in the estimation of the jury, may have accounted for the sudden development of the latent injuries inflicted upon her by those perils. We are not prepared to say this inference is an irrational one.

The counsel for the defendants further argues that the

evidence fails to show that the master had authority to sell the vessel and thereby turn a trifling, partial loss into a constructive total loss. The authority of a master to sell a vessel or cargo in case of marine disaster rests exclusively upon the ground of necessity. In kind, the necessity is not a legal or physical necessity, but a moral one; and though different courts and jurists use various epithets to intensify the degree of the requisite necessity, these add little significance to the simple language, moral necessity. The necessity need not be actual, for the next wave that comes may deliver the ship from her perils, but it must be apparent from the surrounding circumstances, and the master must act from a conviction of its actuality. Viewed from his stand point, the facts and circumstances must exclude every rational theory that the interests of those he represents would be subserved in any other way than by a sale; or, in other words, to refrain from selling, to a man of ordinary maritime experience and intelligence as a shipmaster, must seem to be the violation of a manifest moral duty. *Prince* v. *Ocean Insurance Co.*, 40 Maine, 481; *Butler* v. *Murray*, 30 N. Y., 88.

The questions which force themselves upon a master in case of disaster to his vessel are, what is the extent of the injury? Is it a partial loss, or a technical or constructive total loss? What are the dangers of further damage? What means of rescue are at hand, and what are the facilities for using them? What are the chances and cost of repairing the vessel where she lies? If she cannot be there repaired, can she be taken to another port, and what are the opportunities and probable expense of repairing her at such port? What are the nature and condition of her cargo and the means and expense of transhipping or landing it? What are the available channels of communication with the owners or insurers? If a claim of salvage has intervened, what effect ought that consideration to have in determining his course? The duty of the shipmaster to sacrifice a part and oftentimes the greater part of the value of the ship by sale,

in order to save the balance, is not always easily discernible; but when it is, it is as obligatory as his duty to engage the most advantageous freights, seek the best markets, or make the quickest despatch.

The fact that the master was, also, owner of the vessel, does not materially change his rights, duties and obligations in the premises. The burden of proof is upon the plaintiffs to establish the necessity for the sale, and that the master acted in good faith. It is also incumbent on them to show, in the language of the policy, "by positive proof, that a further loss would have been sustained by waiting for advice" from the defendants, the master not having advised them of the condition of the vessel, or of his intention to sell.

Was there a moral necessity for the sale? In such cases, the master acts for the owners or for the insurers because they cannot act personally for themselves. It is their right to have the vessel sold, or to repair her; and if she can be kept safely until they can be consulted in regard to the sale, the necessity to act for them ceases. The damage to the "Arbutus" was not very serious. The master was on board of her every day for ten days after the disaster, "looking around her and saw nothing out of shape" except a plug hole which was not filled when she left Cardenas. She had been rescued from peril and taken into Cardenas harbor, forty miles from the place of her disaster, in a few hours afterward, under her own sails, and lay only a quarter of a mile from the wharf. According to the testimony of Mr. Churchill, an experienced merchant of Cardenas, and consignee of the "Arbutus'" outward cargo, the vessel might have been hove down by any of the wharves in Cardenas, and her bottom examined, and the injury to her wale repaired, as was the custom with vessels of her class. The same witness, also, testified, the total expense of landing her cargo would not have exceeded a hundred dollars, though the master's estimate exceeds twice that sum. The expense of keeping the vessel in case of delay, would have

been the trifling wages of one or two shipkeepers which must in any event have been borne by the insurers, and she would meanwhile have remained at their risk. She did lie there in safety for ten days prior to the sale, and there is no evidence that she might not have continued there without further damage for an indefinite period. The mail left Cardenas for New York once a fortnight. The alternatives of letting the vessel remain in safety and with small expense, of discharging her cargo at trifling cost, of having her examined to ascertain the extent of the injury, and of repairing her without difficulty, if her damage should be found not very serious, and of communicating with the insurers, were thus all open to the master and seemed not only to invite but to command him to consult them. How then can it be said, in the language of the policy stipulating for notice to the underwriters, "that there was positive proof that a further loss would have been sustained by waiting for advice" from them? Most certainly the *spes recuperandi* was worth as much to them as to the purchaser, and they were entitled to the benefit of an election whether to sell or repair the vessel. If they had had the opportunity to make this election, there can be no doubt but they would have adopted the latter alternative. The burden is on the plaintiffs to prove the necessity for a sale, but the proof adduced most emphatically negatives the existence of such necessity. *Patapsco Ins. Co.*, v. *Southgate*, 5 Pet., 490; *Hall* v. *Franklin Ins. Co.*, 9 Pick., 466.

Nor is the plaintiffs' case relieved by the claim for salvage. The sale was not compulsory; no appeal had been made to a court of admiralty. A compulsory sale could only have been made upon judgment of such court. Proceedings in admiralty are necessarily attended with delay; and before an order of sale could have been obtained, there would ordinarily have been time to consult the insurers. Besides, in case of sale under legal process, the additional expense would be more than compensated by the guaranty of good faith it would have afforded. Under the circum-

stances of this case, too, the proximity of the disaster to
Cardenas, and the trifling danger, difficulty and expense of
relieving the vessel, and taking her into port, it is appar-
ent that a court of admiralty would have disallowed no
inconsiderable part of the exorbitant claim for salvage,
though the master allowed it without cavil, or question,
or even submitting it to arbitration. The salvors were
bound to take due care of the vessel and to afford every
requisite facility for improving its condition, on peril of
losing their claim. There is not a scintilla of evidence to
show that it would have cost anything like fifty per cent. of
the value of the vessel to repair her, a rule which courts have
adopted as indicative of the necessity for abandonment.
Ship-owners hold title to their ships by a frail tenure, if
they are to be thus divested of it, and insurers in vain
stipulate, in their policies, for notice of disasters, if these
are to be thus disregarded.

In order to justify a sale by the master, necessity and
good faith must concur. The necessity cannot be inferred
from good faith, for the master's judgment may have been
at fault; but it must be determined from the circumstances
as they existed at the time. Nor can good faith be inferred
from necessity; for the master may have colluded with
the purchaser in the sale; but the inquiry whether a pru-
dent owner, then and there present, and uninsured, would
have done as the master did, may aid the jury in deter-
mining whether good faith had been maintained. The mas-
ter's good judgment will not make that a case of necessity
which would not otherwise be, nor his bad judgment pre-
vent that from being necessary which would otherwise be
necessary. The authorities concur in the doctrine that if
the damage sustained was of trivial amount, and could
have been repaired at the place where the ship is, or may
be readily taken, there is no necessity for the sale, whatever
may have been the judgment or faith of the master. *Win*
v. *Columbia Ins. Co.*, 12 Pick., 279; 7 Sergt. & Lowb.,
275; *Clark* v. *Mass. M. and F. Ins. Co.*, 2 Pick., 104.

Were it necessary for us to pass upon the question of the master's good faith, we should say that his neglect to ascertain the extent of the injury and to notify the insurers, under the circumstances of the case, and his allowance of the exorbitant claim for salvage, without awaiting the judgment of a court of admiralty or submitting the matter to arbitration, indicate, at least, a lack of judgment, if not of good faith. But it is unnecessary for us to decide that question.

The power of sale is liable to such great abuse, that it should be carefully watched; and it is the duty of courts to take care that the safeguards which the law has thrown around the rights of owners and insurers should not be entirely swept away by the failure of the jury to make a proper application of them. If the sale had been necessary, the plaintiffs would be entitled to recover for a total loss without abandonment, but the sale being unauthorized, the plaintiffs have put it out of their power, by the sale, to make the abandonment necessary in case of a constructive total loss, and can recover only for a partial loss.

*Exceptions overruled, — Motion sustained, —*
*Verdict set aside, and new trial granted.*

APPLETON, C. J., CUTTING, WALTON, BARROWS, DANFORTH, and TAPLEY, JJ., concurred.