Dunning *v.* Merchants Mutual Marine Insurance Company.

BENJAMIN DUNNING *vs.* MERCHANTS MUTUAL MARINE INSUR
ANCE COMPANY.

Neither the sale of a vessel by necessity, nor the abandonment of her, can be justified, unless it will cost more than half of her value, after deducting one-third new for old, to repair her.

While, as a general rule, the assured cannot convert a partial loss into a constructive total loss, by withholding the means necessary for the repairs of the vessel, this principle is not applicable to cases where the damage is sufficient to justify an abandonment.

To authorize the master to hypothecate his vessel in bottomry, substantially the same necessity must exist as would justify a sale by him.

The assured is not precluded from recovering as for a total loss under a policy when the master has sold the vessel from necessity, after the owners had abandoned her.

A charterer is not bound to make repairs or incur charges exceeding one-half the value of the vessel, after deducting one-third new for old, for the purpose of prosecuting the voyage, and earning the whole freight, but he may abandon both ship and freight, and recover for a total loss against the respective underwriters.

ON EXCEPTIONS AND MOTION.

ASSUMPSIT to recover the sum of $1,250 insurance on the vessel, and $1,500 on the freight of the bark John Curtis.

It appeared that the vessel was of 539 tons burden, and valued in the policy at the sum of $20,000. The freight was valued at $8,000.

No question was made as to the value of the plaintiff's interest in the vessel and freight, execution of the policy, proof of loss, or the reasonable commencement of the action.

It appeared that in May, 1866, the bark, properly manned and seaworthy, sailed in ballast from New Orleans to Havana, where she effected a charter, wherein it was agreed that she should go to Turk's Island, and take thence a cargo of salt to Boston, or some port adjacent thereto.

That while on her passage to Turk's Island, in fulfillment of her charter-party, she encountered a hurricane, which continued thirty-six hours, during which she was thrown down on her beam-ends,

and, in order to allow her to come up head to the wind, her fore-top-mast was cut away, which carried with it the foretop-mast head, with the foretop-gallant-mast, and all the spars, sails, and rigging connected therewith; that her stern windows were driven in, her sails split, and blown out at the gaskets, the jib-boom sprung, bow-sprit started, maintop-mast cross-trees split, rudder broken, fifty-five feet of her starboard bulwarks carried away, all her spars and rigging aloft more or less injured, and the vessel badly strained by violence of the sea.

That after the storm abated, she, in this disabled condition, strained, dismasted, and leaking, made the nearest port; that when off Nassau, the condition of the sea prevented her crossing the bar, and while making her way to the leeward of the island, for anchor-age, she misstayed, and went upon a coral reef, about five miles from shore; that the master obtained assistance; that she lay on the reef five days, pounding heavily, when she was got off by wreckers, and towed into Nassau.

That during the time she lay on the reef, her remaining masts jumped, her decks rose and fell with the tide, she was chafed and broomed, her keel worn off, her timbers started and gaged, her copper torn, twisted, and wrinkled, her seams opened, and her sheer and shape changed.

That the master called a survey; that no tenders were made, or complete estimate for repairs submitted; that survey were of the opinion " that owing to the size of the vessel it would be impossible to do anything with her bottom at Nassau," and advised the captain to " obtain tenders and estimates, to be laid before the owners, or whoever else it may concern; " that the master took the steamer for the United States, arriving home on Friday, October 27th, when he learned that the owners had abandoned to the under-writers October 24th, of which fact they informed the master, and declined having anything more to do with the bark; that they did not inform the master who the underwriters were; that the master consulted an experienced ship-master and ship-owner, and returned to Nassau by the return steamer, when and where he called another

survey of experienced men, who made a survey, obtained tenders and estimates, by which, vouched for in the sworn testimony not only of those who made them, but by many other witnesses, it appeared that the cost of repairs to the bark would have been over twenty thousand dollars in gold; that the bottom of the vessel could not be repaired without taking her out upon the dry dock at Nassau; that no prudent man would make a voyage, at that season, to any other port, in a vessel so injured; and that repairs were difficult and expensive at Nassau.

That the survey unanimously recommended a sale of the bark at public auction; that the master, in a foreign port, having no instructions from the underwriters, with no funds to repair, sold her, after due notice in the public papers, to the highest bidder.

That she was first purchased by Sawyer & Menendez, of Nassau, with a view of breaking her up; that afterwards, the hulk was purchased by one Saunders, of Nassau, temporarily repaired, sent to Liverpool with a cargo of cotton, and there sold; that the hulk was sold in Nassau for $810 in gold; that Saunders repaired her in Nassau and Liverpool, to the amount of $7,735.46; that she was sold in Liverpool for $6,292 in gold.

It also appeared that on Oct. 24, 1867, the plaintiff abandoned the vessel, then in Nassau, to the underwriters.

There was some verbal testimony drawn from the master on cross-examination, tending to show that he put a bottomry bond on the bark while in Havana; but the testimony was seasonably objected to by the plaintiffs. There was introduced by the defendants, also, the deposition of the United States consul at Nassau, containing a copy of an alleged indorsement upon the bark's register of the bond mentioned, which was seasonably objected to by the plaintiffs.

The verdict was for the plaintiff.

The defendants alleged exceptions to the ruling,

1. That the plaintiff was entitled to recover as for a total loss if the jury were satisfied that the sale by the master was justifiable under the circumstances of the case as proved.

2. That the plaintiff's right to recover, as for a total loss, is resisted by the defendants on another ground. It being in proof that there was what was called a bottomry bond on the vessel, the defendants contend that the plaintiff could not abandon. I instruct you that there is nothing in the evidence to justify you in deciding against the plaintiff's right to recover upon that ground.

3. And also to the refusal of the judge to give the following · instruction requested by the defendants, viz.: That where the master, through necessity, sells the vessel after an abandonment by the owners, such sale does not constitute a total loss under the policy, as between the insured and the insurers.

The defendants, also, filed a motion praying that the verdict be set aside as being against law and the weight of evidence.

*Rowe*, for the defendants, contended that the evidence failed to show that the sale was necessary, and cited *New England Co.* v. brig *Sarah Ann*, 13 Peters, 387, 401; *Hall* v. *Franklin Ins. Co.*, 9 Pick. 466, 478; *Pike* v. *Balch*, 38 Maine, 302; *Stephenson* v. *Piscataqua F. & M. Ins. Co.*, 54 Maine, 55.

In support of the exceptions, the defendants contended that the positions of loss by abandonment and that by necessary sale, are inconsistent with each other. If the abandonment was valid, the loss was total to the plaintiff on October 24, after which he had no interest to be affected by the sale. The master was no longer his agent, and whether the sale was necessary, was a question which could arise only between the master and insurers, or between the insurers and purchaser.

That question can arise between the owners and insurers only upon the assumption, that the damages did not exceed fifty per cent, and that the abandonment was not valid; and on that assumption, the sale, even if justifiable as between the master and owners, does not constitute a total loss under the policy.

The necessity was created by the owners' refusal to furnish funds to repair; and they cannot thus convert a partial loss into a total loss. *Greely* v. *Tremont Ins. Co.*, 9 Cush. 415. *Orrok* v. *Com-*

*monwealth Ins.  Co.*, 21 Pick. 426.    *Hall* v. *Ocean Ins.  Co.*, 21 Pick.
482.

The  bottomry  bond destroyed  the right to abandon.    *Gordon* v.
*Mass.  F.  &  M. Ins.  Co.*, 2 Pick. 249, 260.

The  plaintiff  can  recover  nothing  for loss of freight.    His loss
was  not  occasioned  by the  perils of  the  sea, but by the voluntary
· neglect or refusal  of  the  master and  owners to carry  out their con-
tract.

It is only freight which  the  insured  have  been  prevented from
earning by the perils insured against, that the insurers contract to
pay.    *Moss* v. *Smith*, 67 Eng. C. L. 93.    *Clark* v. *Mass. F. & M.*
*Ins.  Co.*, 2 Pick. 104.

Where  loss on the vessel is partial, nothing can be recovered for
loss of freight.    It matters not if the damages exceed fifty per cent,
if  the  owners  have  lost  right to abandon and are obliged to settle
with insurers as for a partial loss.

There  should  have  been  an abandonment of freight which  the
law, and not the policy, regulates.

*Shepley & Strout*, for  the  plaintiff, cited  *Gordon* v.  *Mass. F. &*
*M. Ins.  Co.*, 2 Pick. 263 ;  *Mutual Safety Ins.  Co.* v. *Cohen*, 3 Gill,
459 ;  *Fuller* v. *Kennebec Ins.  Co.*, 31 Maine, 325 ;  *Prince* v. *Ocean*
*Ins.  Co.*, 40 Maine, 481 ;  *Stephenson* v. *Piscataquà Ins.  Co.*, 54
Maine, 55 ;  *Butler* v. *Murray*, 30 N. Y. 88.

On the necessity of hypothecation.    1 Pars. on Mar. Law, 412 ;
Abbott on Shipping, 210, and cases *infra ;*  2 Dall. 194 ;  Curtis,
Merchant Seamen, 176 ;  The Aurora, 1 Wheat. 96 ;  9 Johns. 29 ;
The Packet, 3 Mason, 255 ;  *Huzzy* v. *Huzzy*, 2 Wash. C. C. R. 145.
· *Keith* v, *Murdock*, 2 Wash. C. C. R. 297 ;  *Fontaine* v. *Col. Ins.  Co.*
9 Johns. 29 ;  *Rucher* v. *Conyngham*, 2 Pet. Adm. R. 208 ;  *Gibbs* v.
*The Texas*, Crabbe, 236 ;  2 Pars. Mar. Ins. 119 ;  *Carter* v. *Am. Ins.*
*Co.*, 7 Conn. 564 ;  *Buckman* v. *Com. Ins.  Co.* 5 Duer, 342 ;  *Bry-*
*ant* v. *Com.  Ins.  Co.* 6 Pick, 131 ;  2 Phill. on Ins. 342, § 1630 ;
*Graves* v. *Wash. Ins.  Co.* 12 Allen, 394.

DICKERSON, J..  Assumpsit on a  policy of marine  insurance  on

vessel and freight. The verdict was for the plaintiff, and the case is presented on exceptions and motions.

The first instruction complained of is as follows : " the plaintiff is entitled to recover, as for a total loss, if the jury are satisfied that the sale by the master was justifiable under the circumstances of the case as proved." This was equivalent to saying to the jury that there was sufficient evidence to justify a sale by necessity, if the jury should be satisfied of its truth. Whether a sale is justifiable from necessity is a mixed question of law and fact. The facts admitted, it is a question of law ; the facts controverted, it is a question of fact under the rules of law applicable thereto. *Bryant* v. *Commonwealth Ins. Co.*, 13 Pick. 553. It is a well-established rule of law, that, in order to justify a sale by necessity, the damage to the vessel must be of such a nature and extent as to authorize an abandonment ; and, in general, there can be no valid abandonment, unless it will cost more than one-half the value of the vessel to repair her, deducting one-third new for old. *Crook* v. *Commonwealth Ins. Co.*, 21 Pick. 456. *Hall* v. *Ocean Ins. Co.*, 21 Pick. 472. *Greely* v. *Tremont Ins. Co.*, 9 Cush. 420.

The necessity requisite to justify a sale by the master, though not necessarily actual, must be an apparent moral necessity. In the language of the court in *Stephenson* v. *Piscataquis Ins. Co.*, 54 Me. 77 : " Viewed from the master's standpoint, the facts and circumstances must exclude every rational theory that the interests of those he represents would be subserved in any other way than by a sale ; or, in other words, to refrain from selling, to a man of ordinary maritime experience and intelligence as a ship-master, must seem to be the violation of a manifest moral duty." *Prince* v. *Ocean Ins. Co.*, 40 Me. 481.

These authorities are equally explicit, that good faith and necessity must concur in order to justify a sale of the vessel by the master, from necessity.

Upon examining the evidence as to the damage actually done to the vessel, the estimated expense of repairing her at Nassau, made by competent persons of that place ; the expense and difficulty of

taking her to a port of the United States for repairs; the low figure at which she was sold and resold at the place of repair; the cost of the temporary repairs actually made on her, and the reduced price she brought in Liverpool, we think the jury were authorized in coming to the conclusion that it would cost more than fifty per cent of the value of the vessel to put her in a suitable state of repair, deducting one-third new for old; and that, therefore, there was sufficient ground for abandoning her. If in addition to the valid cause for abandonment, thus established, we consider the master's destitution of funds, his ignorance of the residence of the underwriters, and the unanimous judgment of the second survey in favor of an immediate sale of the vessel, we cannot but conclude that the sale by the master was justifiable. The master's visit to the owners for instruction, his return to the vessel after he learned they had abandoned her, the several surveys called by him, and his other acts indicate, at least, a desire on his part to do his duty. Nor can this result be avoided on account of the negligence of the plaintiff in furnishing the funds necessary to repair the vessel. While, as a general rule, it is not competent for the assured to convert a partial loss into a constructive total loss, by withholding the necessary means to repair the vessel for the purpose of charging the underwriters with a larger amount than they ought to pay under the policy, we do not understand that this principle applies to cases like the one at bar, where the damage is sufficient to justify an abandonment. To hold otherwise would be to make the right of abandonment to depend, not upon the question whether the cost of repairs made exceed half the value of the vessel, but upon the pecuniary ability of the assured, coupled with his opportunity to repair her; in short the application of the principle contended for by the defendants' counsel to this case is in direct conflict with the long-established American rule upon this subject. *The American Ins. Co.* v. *Ogden,* 20 Wend. 286.

The next question reserved in the exceptions is predicated upon the judge's instruction to the jury " that there was nothing in the evidence in regard to a bottomry bond on the vessel to justify them

in deciding against the plaintiff's claim to recover." No bond was offered in evidence. The evidence touching that matter came exclusively from the master; and if that is not too vague and shadowy to show that a bottomry bond was put upon the vessel after the insurance was effected, it utterly fails to show that any such instrument was executed by the master under any such exigency as the law requires in such cases. Substantially the same necessity must exist for hypothecating the ship that is required to justify a sale by necessity. If the master have sufficient funds of his own, or belonging to the owners, or can obtain them on the owners' credit, he cannot bind the ship by giving a bottomry bond. He cannot give such a bond to secure his own private debt, or to pay a debt of the owners; it is only to meet an existing emergency in respect to the employment of the ship that cannot otherwise be provided for, that the master has authority to place such an incumbrance upon her. The case is barren of any evidence of the existence of such exigency, and of the lawfulness of the purpose for which the instrument in question was executed. There is also the same paucity of evidence to show that the master executed a valid mortgage or pledge upon the vessel. 1 Parsons' Mer. Law. 412. 2 Dallas, 194, 9 Johns. 29. 1 Wheat. 96. *Huzzey* v. *Huzzey*, 2 Wash. C. C. 155–297.

The presiding judge very properly instructed the jury to disregard the evidence upon this branch of the case.

3. We know of no rule of law by which the assured is precluded from recovering as for a total loss, under a policy, when the master sells the vessel from necessity, after the owners have abandoned her. If the abandonment was valid, it constituted a constructive total loss; if it was unauthorized, it could have no effect upon the rights of the parties. When, in such cases, there is no abandonment, the master acts both for the assured and the underwriters; when there is an abandonment, he acts for the latter only. It would do violence to the natural instincts of justice, as well as be a perversion of the law, to deny to the assured the right to recover as for a total loss, after abandonment, because the master, acting with-

out his authority, as the agent of and for the benefit of the under-writers, sold the vessel from necessity.

It remains to consider the effect of the sale upon the right of the plaintiff to recover freight. While it is true, as the learned counsel for the defendants contends, that it is only freight which the insured have been prevented from earning by perils insured against, that the insurers contracted to pay, it is also true, that if the owner or charterer is wholly prevented from earning the freight insured upon, by the ship being wrecked, or other perils insured against, it is an absolute total loss. 2 Phillips on Ins. 352. Nor in case of a constructive total loss of the ship by dam-ages over fifty per cent of its value under the American rule, is the assured on freight obliged to waive his right to abandon the ship, and make repairs, or incur charges exceeding half its value for the purpose of prosecuting the voyage, and covering the whole freight; but he may abandon both ship and freight, and recover for a total loss against the respective underwriters on each. *American Ins. Co.* v. *Center*, 4 Wend. 45. In *Herbert* v. *Hallett*, 3 Johns. Cases, Mr. Justice Kent says : " It appears to me that the same peril and to the same extent, ought to exist to authorize a recovery on a policy on freight, as on a policy on the ship." Also, in *Clark* v. *Mass. F. & M. Ins. Company*, 2 Pick. 104, cited by the defendants' counsel, the court say, that if the disaster had terminated the con-tracts, the owners of the vessel would have been entitled to recover his freight of the underwriters. In that case, the vessel was repaired, and the court held, that the owner of the ship should have retained the cargo, and forwarded it in the vessel, after she was repaired, and thus earned the freight, instead of surrendering it to the shipper, and calling upon the underwriters for his freight. The case of *Moss* v. *Smith*, 67 Eng. C. L. 93, also cited in defense, is inapplicable, as the English courts do not recognize the American rule in respect to the amount of damages necessary to be done to the vessel in order to entitle the owner to the right of abandon-ment.

In the case at bar, the sale being justifiable, the plaintiff would

be enabled to recover as for a constructive total loss, though there had been no formal abandonment.

Having disposed of the motion in considering the first question raised in the exceptions, we do not deem it necessary to discuss that subject any further. *Exceptions and motion overruled.*

CUTTING, WALTON, BARROWS, DANFORTH, and TAPLEY, JJ., concurred.