charge of this horse, and used him as a carriage horse. The principal fact relied on to support the title of Dennis Seymour is that in 1891 the horse was advertised for service under the name of "Dennis Seymour, Owner." It appears, however, that this advertisement was prepared by the testator and his brother, and that the horse was advertised for service at the farm of Dennis Seymour. The testator was a Catholic priest, and lived in the city, and could not have conveniently taken charge of a horse advertised for service, while his brother Dennis was a farmer, and could. In December, 1892, the testator took the horse to a veterinary surgeon, by whom an operation was performed, and the horse was kept for 25 days, until December 26, 1892, when the testator paid the bill. In March, 1893, the horse was in the possession of the testator, and used as a carriage horse, and the testator offered to sell him. September 6, 1893, the testator delivered the horse to one William Morris, to be trained, who kept him for 52 days, and the testator paid the bill. In November, 1894, shortly before the testator left for Texas, the horse was in his possession, and he offered to sell him to Michael P. Conway. When the testator left for Texas the horse was taken to the farm of his brother Matthew, who was one of his executors, and not to the farm of Dennis, who claims the horse then belonged to him. If this horse had belonged to Dennis for several years, why was it delivered by the testator, when he left for Texas, to his brother Matthew, who retained it in his possession until after the death of the testator? It seems to me that the evidence in this case, saying nothing about the legality of some of it, relied upon by the respondents, falls far short of showing that this horse was given and delivered by the testator to James Seymour, his deceased nephew, or to any one else. The testator is the only person who is shown to have used and exercised absolute control of the horse down to December, 1894, when the testator left for Texas, where he died.

It seems to me that the findings of the surrogate's court are not sustained by the weight of evidence, and that its decree should be reversed, the findings of the referee affirmed, and the surrogate's court directed to charge the account of the executors with this horse, and the appellant be awarded the costs of this appeal, and of the proceedings in the surrogate's court, payable out of the estate. All concur, except HARDIN, P. J., not voting.

---

(24 Misc. Rep. 646.)

BUEL v. BALTIMORE & O. S. W. RY. CO. et al.

(Supreme Court, Special Term, Erie County. October 7, 1898.)

1. RAILROADS — MORTGAGES — APPLICATION OF EARNINGS — REMEDY OF BONDHOLDERS.

A mortgage to secure income bonds of a railroad provided a specific remedy in case of default, and required bondholders to give 30 days' notice to the trustee of any default, and a demand by the holders of one-fourth of the bonds, together with a tender of security for the expenses of the proposed litigation, and the refusal of the trustee to proceed, as a condition precedent to a right of action by any bondholder for any default, and provided that neither the trustee nor any bondholder should

institute any suit, except as in the mortgage provided. The trustee became trustee of other subsequent mortgages made by the company, and permitted the company's net earnings to be diverted to the payment of interest on the junior bonds, after the interest on the income bonds was in default. *Held*, that the owner of the majority of the income bonds could bring an action for an accounting and to restrain a further diversion of the net earnings, without giving the required notice or making a previous demand on the trustee.

2. SAME.

A railroad mortgage securing income bonds required the company's directors to apply the net earnings to the payment of interest, and provided that the company should annually declare the net earnings applicable thereto, and distribute the amount so determined among the bondholders pro rata. The property pledged as security for the bonds being consolidated with other lines of railroad, the company mingled the earnings, and refused to appropriate any part of its income to payment of interest, or to determine whether there was any income applicable thereto. *Held*, that the company's failure to determine the amount of net earnings applicable to interest did not preclude a bondholder from compelling an accounting therefor.

3. SAME—PLACE OF ASSERTING RIGHTS.

A mortgage of a foreign railway to a New York trustee to secure its income bonds provided that the company's directors should annually furnish the trustee with a statement of the amount of net earnings available for interest, and, in case of a dispute over its correctness, the trustee should apply to the courts of Ohio for an accounting, such remedy to be exclusive. A subsequent provision made all rights of entry and sale given by the mortgage additional to any legal remedy. With the trustee's acquiescence, the company furnished no statement and paid no interest. *Held*, that the provision requiring suit to be brought in Ohio does not preclude the. owner of a majority of the bonds from suing in New York for an accounting of interest; it applies to the trustee alone.

4. CONTRACTS OUSTING JURISDICTION—VALIDITY.

A provision in a mortgage requiring the trustee to resort to a forum in a state of which he is not a resident, and making the remedy for a default provided in the mortgage exclusive, is void, as against public policy.

5. COURTS—JURISDICTION—EXTENT—PROPERTY IN ANOTHER STATE.

Where railroad property, located in Ohio and owned by a company organized under the laws of that state, is mortgaged to a New York trustee, who acquiesces in a default on the mortgage and in a diversion of the company's income contrary to the provisions of the mortgage, the courts of New York have jurisdiction of an action by a bondholder of that state against the trustee and the company to restrain the diversion and compel an accounting.

6. INJUNCTION PENDENTE LITE—RAILROADS—MORTGAGES—INSOLVENCY.

Where interest on railroad bonds is payable out of the net earnings only, and the company diverts its net earnings and refuses to pay any interest, a further diversion will be restrained pending an application for an accounting by a bondholder, and this regardless of the solvency of the company.

Action by Franklin S. Buel against the Baltimore & Ohio Southwestern Railway Company and others for an accounting and for other equitable relief. Heard on motion by plaintiff for injunction pendente lite. Granted.

Charles Walter Artz and Frank Rumsey, for plaintiff.
John G. Milburn, for defendants.

WOODWARD, J. The Baltimore & Ohio Southwestern Railroad Company was organized under the laws of the state of Ohio, and prior

to the 1st day of November, 1893, operated a line of railroad from Belpre to Cincinnati, within the state of Ohio, the road, with its several branches, embracing about 282 miles of track. During the same period the Ohio & Mississippi Railway Company, a corporation of the states of Ohio, Indiana, and Illinois, operated its main line of railroad from Cincinnati to East St. Louis, and, with certain branches, had a mileage of about 635 miles. These two corporations, pursuant to the laws of the state of Ohio, entered into an agreement, on the 1st day of November, 1893, by which they were consolidated, taking the name of the Baltimore & Ohio Southwestern Railway Company. To this consolidated company all the lines of both constituent companies, together with their franchises and other property, were transferred, and the same have since been possessed and operated by the new corporation. Prior to this consolidation, and on the 28th day of December, 1889, the Baltimore & Ohio Southwestern Railway Company made a deed of trust or mortgage to the Farmers' Loan & Trust Company, securing an issue of first preferred income mortgage gold bonds, amounting to $5,500,000. At that time there was a mortgage on its property given to secure its first mortgage bonds, amounting in the aggregate to the sum of $11,000,000. Article third of the trust deed provides that:

"It is hereby further covenanted and agreed that the said party of the first part shall apply the net earnings of the said railroad company. so far as the same may be available, after the payment of all interest charges as is hereafter defined, to the payment of interest up to five per cent. per annum upon the bonds hereby secured. If such net earnings of the railroad company, available during each fiscal year for the payment of the interest on the bonds hereby created, shall not be sufficient to pay such interest in full, so much of said interest as shall remain unearned shall not accumulate; it being expressly understood and agreed by and between the parties hereto, and by and among all the persons who shall be or become the owners of any of said bonds, that the words 'net earnings' shall be held to signify the sum remaining of the gross profits, earnings, income, and receipts of the railroad and property, from all sources, during each fiscal year ending the thirtieth day of June, after deducting therefrom all the expenses of maintaining, operating, renewing, replacing, and repairing its said railroad, property, and equipment, including such reasonable improvements thereof and additions thereto as shall be necessary for the safe, proper, and economical operation of the same, and also all rentals incident to the operation thereof, and also after deducting all taxes and assessments imposed upon or against the said railroad property, or the income or earnings thereof, and the interest at the rate of four and one-half per centum per annum on eleven millions of dollars of the first mortgage gold bonds of the party of the first part, or such portion thereof as may be outstanding, and the interest upon such bonds of the Cincinnati & Baltimore Railway Company as shall not have been exchanged for said last-named bonds. That within three months after the thirtieth day of June in each and every year, commencing with the thirtieth day of June, 1892, the board of directors of the party of the first part shall and will determine and declare the amount of such net earnings, if any, for the year ending on the said thirtieth day of June, distributable among the holders of the said first preferred income mortgage bonds; and when so determined and declared, and on the first day of October in each year, the said party of the first part will pay, at its agency in the city of New York, to the holders of the said bonds, respectively, pro rata, equally as aforesaid, the amount of such net earnings which the said board of directors shall have determined and declared to be distributable among, and payable to, the holders of the said bonds as aforesaid."

By the terms of the consolidation above set forth, the holders of these first preferred income bonds were to be given 18 per cent. of the new guarantied first consolidated mortgage gold bonds, on a payment of a premium of 5 per cent., and 82 per cent. of "A" income bonds of the new corporation; the intention being to retire the first preferred income bonds of the railroad company. This plan was so far successful that, with the ·exception of the fourteen $1,000 bonds held by the plaintiff in this action, and three others, which do not appear in the records, all of the first preferred income bonds of the Baltimore & Ohio Southwestern Railroad Company were retired, and the securities of the new corporation were issued in their stead. It is conceded, in harmony with a long line of judicial decisions, that the plaintiff lost no rights under the consolidation; that he had a perfect right to elect whether he would relinquish the bonds and accept the new securities, or whether he would stand upon his rights under the original income-bonds mortgage; but it is urged that, under the conditions of the trust deed, he has no standing in court, and that his rights cannot be determined in this court, the property involved being outside the jurisdiction, and the defendant railway company being organized under the laws of the state of Ohio.

Immediately upon its organization the defendant railway made its certain indenture of mortgage, a copy whereof is annexed to the complaint, conveying all its railways, branches, rights, equipment, franchises, and income, among other things, and including the same property described in the original mortgage, known as "Exhibit A," to the defendants Farmers' Loan & Trust Company and W. H. H. Miller, as trustees to secure the payment of an issue of $37,500,000 of first consolidated mortgage gold bonds, bearing 4½ per cent. interest, and payable as in said mortgage described. On the same day the defendant railway company also executed a certain other deed of trust or mortgage upon its aforesaid property to the Farmers' Loan & Trust Company, to secure an issue of $8,750,000· of bonds, known as "Income Bonds, Series A," bearing interest to be paid out of net income at not to exceed the rate of 5 per cent. per annum. On the same day the same defendant railway company also executed a certain other mortgage or deed of trust to the same trustees to secure an issue of $10,000,000 of bonds, known as "Income Bonds, Series B," bearing interest to be paid out of net income at not to exceed 5 per cent. per annum. The complaint shows that these mortgages occupy a relative position as to priority by themselves indicated by the order in which they are named.

It is alleged in the complaint that while interest has been paid upon the consolidation bonds, and upon series A of the income bonds, of the new company, no interest whatever has been paid to the holders of the first preferred income bonds of the Baltimore & Ohio Southwestern Railway Company since the consolidation, although such income bonds constitute a prior lien upon the property, and prior to the consolidation had been earning interest. The plaintiff, therefore, demands that an accounting be ordered of the income of the Baltimore & Ohio Southwestern Railroad property to determine the amount of interest which has been earned and withheld from him, and that a

writ of injunction issue to restrain the several defendants from paying interest upon the junior liens until he has been paid the amount of net earnings of the property to which he is entitled, under the terms of the mortgage, made to secure his bonds.

It is not necessary, in this discussion, to go into the detailed financial statement by which the plaintiff seeks to establish his equitable rights in the premises. It is sufficient to know, assuming the truth of his allegations, that the funds pledged to the payment of interest upon his bonds are being used to pay the interest upon liens junior to his own, and this brings us to the consideration of his standing in court, and of the jurisdiction of this court to determine the rights of the several parties in interest.

The trust deed of 1889, under which the plaintiff claims, provides that:

"The party of the first part shall, on or before the 15th day of September of each year, furnish the trustees with a statement showing the amount of the net earnings applicable to the interest on the bonds secured by this mortgage, and give public notice of the rate of interest that will be payable on said bonds on the first day of the succeeding October. A like statement for the two periods of fifteen months, or any part thereof, as hereinbefore mentioned, shall be furnished to the trustees at least fifteen days before said net earnings are payable to the holders of said bonds, and like notice of the rate of interest so payable shall be given by publication as aforesaid. If the trustee shall not be satisfied with the aforesaid statement, and if it be notified by the holders of twenty-five per cent. in amount of the said bonds then outstanding that they object to the same, it shall be its duty to so notify the railroad company within the period of thirty days from the rendition of the said statement, and the said trustee shall have the right to inspect the books of the said railroad company by its proper officer, or by an expert accountant appointed for the purpose, who shall be paid for his services by the said party of the first part. If, for any reason, the railroad company and the trustee cannot agree as to said statement, and if the trustee be called upon to proceed by the holders of twenty-five per cent. in amount of said bonds then outstanding, who shall also have duly indemnified the trustee against all liability for costs and expenses, then, and in that event, it shall be lawful for, and the duty of, said trustee to file a bill in equity against the railroad company, in any court of equity in the state of Ohio, for an account of the net earnings, under the provisions for this mortgage; and if the final decree of the court shall be that there are net earnings available, under the terms of this mortgage, for the purpose of paying the interest on said bonds, beyond the amount set forth in the statement furnished by the party of the first part to the said trustee, and advertised for payment, then, unless the party of the first part shall, within three months after such final decree, pay the said balance of the net earnings so determined to be available and due as aforesaid, by way of interest to the said bondholders, such nonpayment shall constitute a default in the payment of interest, for which the trustee shall be authorized to proceed under the terms of the fourth and fifth articles of this mortgage. The remedy herein provided for ascertaining the amount of the net earnings, in case of dispute, shall be exclusive of all others."

Articles fourth and fifth of the trust deed provide that:

"If the party of the first part, its successor, successors, or assigns, shall at any time hereafter refuse, neglect, or omit to determine and declare its annual net earnings distributable and payable among the holders of said first preferred income mortgage bonds, or to pay the same when determined as herein provided, for any period exceeding six months after demand made, or shall, after demand made, make default, or refuse, neglect, or omit for any period after the maturity thereof to pay the principal sum of each and all of the said

bonds, or shall suffer or allow any lawful taxes or charges to fall in arrears, whereby the security of this mortgage may be impaired, or shall refuse or fail to keep or perform any of the covenants and stipulations contained herein, or in the bonds secured or intended to be secured hereby, and on its part to be kept and performed, then, and in either of such events, the party of the second part shall, upon the written request of the holders of one-fourth in amount of the bonds secured hereby and then outstanding, and upon adequate security and indemnity against all costs, expenses, and liabilities to be by the party of the second part incurred, and not otherwise, forthwith demand, and, with such force as may be necessary, enter upon, take, and maintain, possession of all and singular the railroads, depots, and all the estate, premises, rights, contracts, and franchises hereby conveyed and mortgaged, or agreed or intended so to be, and, as the attorney in fact or agent of the said party of the first part, by its agents and substitutes duly constituted, or by its managers, superintendents, receivers, or servants, have, hold, use, manage, operate, and enjoy the same, and each and every part thereof, to as full an extent as the party of the first part might lawfully do, making from time to time all needful and proper repairs, alterations, and additions, and receiving all tolls, income, and revenue thereof; and, after deducting the expenses of such use, operation, reasonable repairs, alterations, and additions, all lawful taxes and assessments on said railroads and property, and the costs or charges of taking such possession, and proper compensation for its services for taking such possession, and management while in possession, and such sum or sums as may be sufficient to indemnify it against any liability, loss, or damage, for or on account of any matter or thing done by it in good faith and in pursuance of its duties as said trustee, the party of the second part shall apply the remaining net income and revenue therefrom, without giving preference, priority, or distinction to one bond over another, to the payment—First, of the amount of the net earnings due on the bonds then outstanding, hereby secured or intended so to be, in full, if said net earnings be sufficient, but, if not, then pro rata; second, in case the principal of said bonds shall have become due, according to the tenor and effect of said bonds or of these presents, then to the payment of the principal of said bonds in full, if the said income and proceeds be sufficient, but, if not, then pro rata.

"Or the said party of the second part shall and will, after or without entering upon or taking such possession, upon the written request of holders of a like amount of said bonds then outstanding, and upon like security and indemnity, and not otherwise, proceed to sell and dispose of all and singular the said railroads, estate, real and personal, corporate rights, franchises, and premises hereby mortgaged, or agreed or intended so to be, to the highest and best bidder, at public auction, in the city of Cincinnati, or in the city of New York, or at such place as the said trustee may designate, and at such time as it shall appoint, having first given notice of the time and place of such sale by advertisement, published not less than twice in each week for three months, in one or more newspapers published in the cities of Cincinnati and New York, or to adjourn said sale from time to time, in its discretion, and after so adjourning to make such sale at the time and place to which the same may be so adjourned, and to make and deliver to the purchaser or purchasers of the said railroads, and their appurtenances, and all other, the said property and franchises thereto belonging, good and sufficient deed or deeds in the law, in fee simple, free from all and every of the trusts hereby created, and without obligation to inquire into the necessity, expediency, and authority of or for any such sale, which sale so made as aforesaid shall be a perpetual bar, both in law and equity, against the party of the first part, and all persons claiming or to claim the said described premises and property, or any part thereof, or any interest therein, by, from, under, or through the party of the first part, and after deducting from the proceeds of such sale proper allowances for all the expenses thereof, including attorney and counsel fees, and all other expenses, additions, or liabilities which may have been paid or incurred by it for taxes or assessments on the said railroads, or the appurtenances, or other property, thereto belonging, or any part thereof, as well as reasonable com-

pensation for its own services, it shall be lawful for the trustee, and it shall be its duty, to apply the residue of the money arising from the said sale, without giving preference, priority, or distinction to one bond over another, to the payment [as provided in the preceding paragraph, paying over any surplus to the party of the first part].

"Or the said trustee shall and will, upon the written request of the holders of a like amount of said bonds then outstanding, and upon like security and indemnity, and not otherwise, proceed to protect and enforce the rights of the bondholders under these presents by a suit or suits in equity or at law, whether for the specific performance of the stipulated covenants and agreements, or any of them, contained herein, on the part of the party of the first part to be kept and performed, whether in aid of the execution of the powers herein granted or otherwise, as the trustee being advised by counsel learned in the law shall deem most effectual to protect and enforce such rights; it being understood, and it is hereby expressly declared, that the rights of entry and sale are intended as cumulative remedies, additional to all other remedies allowed by law, and that the same shall not be deemed in any manner whatever to deprive the trustee or the beneficiaries under this trust of any legal or equitable remedy by judicial proceedings consistent with the provisions of these presents, according to the true intent and meaning thereof.

"And it is hereby expressly declared and agreed that no holder or holders of a bond or of any bonds secured hereby shall have the right to institute any suit, action, or proceeding, in equity or in law, for the foreclosure of this mortgage, or the execution of the trusts thereof, or for the appointment of a receiver, or for any other remedy, without first giving thirty days' notice in writing to the trustee of the fact that default has occurred and continued as aforesaid, nor unless the holders of at least one-fourth in amount of the said bonds then outstanding have made request in writing to the trustee as above provided, and have afforded it a reasonable opportunity to proceed to execute the powers hereinbefore granted, or to institute such action, suit, or proceedings in its own name, and have also offered to it adequate security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and such notification, request, and offer of indemnity are hereby declared to be conditions precedent to any action or cause of action for the foreclosure of said mortgage, for the application for the appointment of a receiver, or for any other remedy hereunder; it being understood and intended that no one or more holders of bonds shall have the right in any manner whatever to affect, disturb, or prejudice the lien of this mortgage by his or their action, except in the manner herein provided, but that all proceedings, in law or equity, shall be instituted, had, and maintained for the equal benefit of all holders of said bonds outstanding."

### Article sixth provides that:

"It is hereby further covenanted and agreed that neither the trustee, its successor or successors, or holder or holders, of the bonds secured, or intended to be secured, hereby, or any of them, shall sell the premises hereby mortgaged, or intended so to be, or any part thereof, or institute any suit, action, or proceeding, in law or equity, for the foreclosure hereof, or for the appointment of a receiver, otherwise than in the manner herein provided."

It is not claimed in the moving papers that the plaintiff, or the holders of 25 per cent. of the bonds outstanding, have complied with the above provisions in reference to notice to the trustee of default or in affording indemnity, but it is alleged and charged that:

"The said Farmers' Loan & Trust Company, by its acceptance as mortgagee of the first consolidated mortgage, and the several income mortgages of the defendant railway company, has taken upon itself the exercise of junior trusts hostile in interest to the trust created by the mortgage Exhibit A, and that it is necessary for the holders of bonds secured by said mortgage Exhibit A to make the said trust company defendant as junior mortgagee,

as well as trustee named in said Exhibit A; and the said Farmers' Loan & Trust Company, notwithstanding that the railroad of the said the Baltimore & Ohio Southwestern Railroad Company, and all its property, tolls, and income, were specifically pledged to it for the benefit of the holders of bonds secured by the mortgage Exhibit A, has permitted the income of the mortgaged property to be diverted from its appointed trust, and has allowed the income of the mortgaged property to be used to pay the interest on the bonds of the defendant railway company junior in interest and lien, while permitting the interest on the bonds secured by said mortgage Exhibit A to remain in continuous default, and has taken no steps to protect the holders of said bonds, or to secure the proper and agreed application of the income for the payment of interest of such securities. That any request to the said trust company to bring this suit would be tantamount to a request that it bring suit against itself, by reason of its inconsistent position as trustee of the aforesaid conflicting trusts; and for that reason plaintiff has made no such request, but has brought this suit for the benefit of his class."

This is, under the circumstances of this case, sufficient to establish the right of this plaintiff to ask the aid of a court of equity to protect his rights. The object of the clause in which the right of an individual holder of bonds to bring an action is waived is stated to be that it is "understood and intended that no one or more holders of bonds shall have the right in any manner to affect, disturb, or prejudice the lien of this mortgage by his or their action, except in the manner herein provided, but that all proceedings, in law or equity, shall be instituted, had, and maintained for the equal benefit of all bonds outstanding." This was not to protect the trustee or the mortgagor in a refusal to comply with the conditions of the trust deed, but to prevent individual holders of the bonds from prejudicing the lien of the mortgage by litigations for their own benefit, and against the judgment of a reasonable number of those intended to be protected by the mortgage. The plaintiff is the owner of all but three of the $1,000 bonds now outstanding under the protection of this mortgage, and the reason for the provision being at an end, and this action being intended for the "equal benefit of all bonds outstanding," it will not be seriously contended that the plaintiff is bound by this agreement, even should it be conceded that it is not void under the ordinary rules governing public policy. It was said in the case of Nute v. Insurance Co., 6 Gray, at page 181:

"Although, in a certain sense, these are rights or privileges which the party, in the proper time and place, may give or waive, yet a compliance with them cannot be annexed to the contract, cannot be taken notice of and enforced by the court or tribunal before which the remedy is sought, and cannot, therefore, be relied on by way of defense to the suit brought on the breach of such contract."

"It is conceded," say the court in the case of Ettlinger v. Carpet Co., 142 N. Y., at page 192, 36 N. E. 1056, "that the beneficiary may sue where the trustee refuses, but that is because there is no other remedy, and the right of the bondholder, otherwise, will go unredressed. The doctrine does not rest rigidly upon a technical ground, but upon a substantial necessity. In the case of a corporation, a stockholder may sue, not only because it refuses, but because those who represent it are the very parties who have committed the wrong. * * * The bondholders are the real parties in interest. It is

their right which is to be redressed, and their loss which is to be prevented; and any emergency which makes a demand upon the trustee futile or impossible, and leaves the right of the bondholder without other reasonable means of redress, should justify his appearance as plaintiff in a court of equity for the purpose of a foreclosure." This was a case in which the trustee had gone abroad, and there was some reason to believe that he was in such a mental condition as to unfit him for the discharge of the trust, and the court sustained the right of a bondholder to bring an action for foreclosure.

In the case of Brinckerhoff v. Bostwick, 88 N. Y. 52, the court lays down the rule that:

"An action to recover such losses, as before observed, should, in general, be brought in the name of the corporation; but, if it refuses to prosecute, the stockholders, who are the real parties in interest, will be permitted to sue in their own names, making the corporation a defendant. And that course of proceeding is also allowed if it appears that the corporation is still under the control of those who must be made the defendants in the suit. In such a case, a demand upon the corporation to bring the suit would be manifestly futile and unnecessary. A suit prosecuted under the direction and control of the very parties against whom the misconduct is alleged, and a recovery is sought, would scarcely afford to the shareholders' the remedy to which they are entitled; and the fact that the delinquent parties are still in control of the corporation is of itself sufficient to entitle the shareholders to sue in their own names."

The court, at page 60, continuing the discussion, points out a direct analogy to the case at bar, as follows:

"In the present case the corporation cannot sue, because all its rights of action have been transferred by operation of law to the receiver. He certainly is not a proper person to whom to intrust the conduct of the action, even did he consent to institute it, or should the comptroller of the currency direct him so to do, for he is one of the parties charged with misconduct, and against whom a remedy is sought. It necessarily follows that the shareholders must be permitted to sue in their own names, or the wrongs complained of must go without redress, and substantial rights be sacrificed to a mere matter of form. The shareholders are the parties whose interests are involved in the proceeding. If conducted in the name of the corporation or the receiver, it would be as their representative and for their benefit; and when, as in this case, sufficient reasons are shown why it cannot be effectually prosecuted in that form, the right of the shareholders to sue in their own names is sanctioned both by principle and precedent."

See, to the same effect, Weetjen v. Railroad Co., 4 Hun, 529.

In the case of Insurance Co. v. Salisbury, 130 Mass. 303, certain of the bondholders brought an action to compel the trustees of a first mortgage to foreclose the same, alleging that "there was danger, if the interest on the bonds was allowed to increase and the corporation allowed to apply the whole of the income of the mortgaged property to other purposes, that the property would not be sufficient to pay the interest on the mortgage bonds and to pay the principal at maturity; that the omission and refusal of the trustees to take possession of the mortgaged property, and apply the income and profits thereof to the purposes provided in said mortgage, and to foreclose said mortgage, was a violation of the duty imposed by the trust"; and that "said trustees were interested, either personally or as officers of certain institutions, in the bonds secured by the second mortgage, and that the judgment of the trustees was affected adversely to the plaintiffs' rights

by said interest." The court, commenting upon these facts at page 310, say:

"As the defendants hold the mortgage, not to secure a debt due to themselves, but as trustees for the holders of the bonds of the mortgagor, their duties are regulated by the general rules of law which affect all trustees, and whenever they fail to perform them, either through willfulness, indifference, or error of judgment, the bondholders who are aggrieved by their conduct may obtain relief in this court sitting as a court of equity. This is clear; under the general provisions of the statutes giving this court jurisdiction in equity, and under the special provisions relating to jurisdiction in equity of all cases arising out of railroad mortgages. Among the duties of the defendants, as trustees, are these: They must act in good faith for the best interests of the bondholders; they must take care that the property is not wasted nor depreciated; they must see that its income is not improperly diverted from the payment of interest on the mortgage debt as it accrues; and in case of a manifest purpose on the part of the mortgagor to waste or destroy the property, or not to apply the income to payment of interest, to the injury of the bondholders, it is their duty to enter and take possession of the property, and manage it for the security of the cestuis que trustent. Perry, Trusts, § 749. Applying these principles to the case before us, it is clear that the bill states a case which calls for the interference of a court of equity. The plaintiffs are holders of bonds secured by the mortgage. They have no means of enforcing their rights in the mortgaged property, except through the action of the defendants. They allege that the mortgagor has been in default in the matter of the payment of interest for more than six months, and that it has signified a purpose not to pay interest on their bonds, unless they will accept payment at a less rate than the bonds call for; that the property, with the rolling stock of the mortgagor, produces an income sufficient, after paying the running expenses, to pay the overdue interest on the bonds, and to pay the accruing interest; that the mortgagor applies the earnings to pay its unsecured debts, and to uses which do not benefit the plaintiffs, and that there is danger that, if this course continues, the mortgage debt will grow, by the accumulation of interest, to such amount that the mortgage will be inadequate security for its payment. The demurrer admits the truth of these allegations, and, of course, does not set up a state of facts, by way of explanation, which justifies the inaction of the defendants. On these facts it is the right of the plaintiffs that the defendants take possession of the property for the purpose of foreclosure, and manage it, and apply the net earnings to payment of the interest on the bonds."

There is no reasonable doubt of the standing of the plaintiff in this court, and it now remains to be determined whether there is anything in the deed of trust, or in the limitations attaching to courts of equity in this state, in dealing with questions beyond the jurisdiction of the state, which prevents an effective adjudication of this controversy. If there is not, then we are of opinion that the injunction asked for in the present motion should be granted. It is provided in article three of the trust deed that:

"If, for any reason, the railroad company and the trustee cannot agree as to said statement [the declaration of the board of directors as to the amount of the net earnings available for the payment of interest], and if the trustee be called upon to proceed by the holders of twenty-five per cent. in amount of said bonds then outstanding, who shall also have duly indemnified the trustee against all liability for costs and expenses, then, and in that event, it shall be lawful for, and the duty of, said trustee to file a bill in equity against the railroad company in any court of equity in the state of Ohio for an account of the net earnings, under the provisions of this mortgage; and, if the final decree of the court shall be that there are net earnings available under the terms of this mortgage for the purpose of

paying the interest on said bonds beyond the amount set forth in the statement furnished by the party of the first part to the said trustee and advertised for payment, then, unless the party of the first part shall, within three months after such final decree, pay the said balance of the net earnings so determined to be available and due as aforesaid, by way of interest to the said bondholders, such nonpayment shall constitute a default in the payment of interest, for which the trustee shall be authorized to proceed under the terms of the fourth and fifth articles of this mortgage. The remedy herein provided for ascertaining the amount of the net earnings in case of dispute shall be exclusive of all others."

This contract was drawn with the object of prescribing the duties of the trustee in the event of a disagreement between it and the mortgagor in reference to the amount of the net earnings of the railroad, and cannot be understood as a limitation upon the right of bondholders to bring an action in equity against the trustee, in company with the mortgagor, to compel an accounting, when the trustee, who is likewise the fiscal agent of the mortgagor, is engaged in promoting the interests of those holding liens junior to those of this plaintiff. There is no dispute between the trustee and the mortgagor. They are occupying the same position of hostility to the rights of the plaintiff. The mortgagor has failed to make the report of its net earnings which it agreed to do, and the trustee has acquiesced in that neglect of one of the conditions of the contract, and both of these defendants urge the fact of this provision of the contract against the interests of the plaintiff. Whether the clause that "it shall be the duty of the said trustee to file a bill in equity against the railroad company in any court of equity in the state of Ohio" is sufficient to bind the trustee to the exclusive jurisdiction of the state of Ohio, in the event of a dispute, it is not necessary here to determine; but we are satisfied that it cannot be made to extend to the case of a bondholder who is seeking to compel the trustee and the mortgagor to comply with the provisions of the mortgage made for his protection, and the suggestion that the accounting has been withheld because, in merging the two railroads, it became impracticable to meet the requirement, owing to the expense incident to the keeping of separate accounts, is begging the question. "There is," say the court in the case of Insurance Co. v. Salisbury, 130 Mass., at page 311, "no force in the objection that this may render it necessary for the parties in interest to go into litigation to ascertain what property the first mortgage covers, and what it does not cover, in order to settle the rights of the bondholders under the second mortgage, as distinguished from the bondholders under the first mortgage. The rights of the plaintiffs are the same that they would be if the second mortgage had not been made, and there is no reason why they should not enjoy those rights in the fact that the mortgagor has done something, since their rights attached to the property, which will render litigation necessary to define, limit, and enforce them. Nor are the rights of the plaintiffs to be affected by the fact that, if the bill is sustained, and the defendants are required to take possession of the mortgaged road and manage it, a great burden of labor, and a great responsibility, moral and financial, will be imposed on the defendants, in that they will be personally liable for all injuries done and debts incurred to others in managing the property. This burden and responsibility are incident to the trust

which they assumed in taking the mortgage, and it is not for them to say that the cestuis que trustent must suffer, because it is inconvenient, disagreeable, or burdensome for them to do their duty as trustees.    Perry, Trusts, § 763."

But, assuming this provision of the contract, with others contained in the deed of trust, to be intended to apply to the plaintiff in this action, we are still of the opinion that it would not operate to deny him the right to appeal to a court of equity for the righting of wrongs which he may be subjected to by the defendants.    These agreements, which seek to devest the regularly constituted tribunals of jurisdiction of controversies, are against public policy and void.    As was said in the case of Stephenson v. Insurance Co., 54 Me. 70:

"While parties may impose, as a condition precedent to application to the courts, that they shall first have settled the amount to be recovered by an agreed mode, they cannot entirely close the access to the courts of law. The law, and not the contract, prescribes the remedy; and parties have no more right to enter into stipulations against a resort to the courts for their remedy in a given case than they have to provide a remedy prohibited by law.    Such stipulations are repugnant to the rest of the contract, and assume to devest courts of their established jurisdiction.    As conditions precedent to an appeal to the courts, they are void."

This case was cited with approval in Insurance Co. v. Morse, 20 Wall. 445, and is the doctrine of that case.    "But it is well settled," say the court in the case of Pearl v. Harris, 121 Mass. 390, "that an agreement to submit to arbitration will not be held valid, either in law or equity, when its effect is to oust the court of jurisdiction." The same doctrine is asserted in the case of Barron v. Burnside, 121 U. S. 186, 7 Sup. Ct. 931, and in Southern Pac. Co. v. Denton, 146 U. S. 202, 13 Sup. Ct. 44.

It is clear, however, from the reading of the last clause of the fourth article of the trust deed, that it was never intended that the beneficiaries of the trust were to be denied equitable relief wherever it might be found; "it being understood, and it is hereby expressly declared, that the rights of entry and sale are intended as cumulative remedies, additional to all other remedies allowed by law, and that the same shall not be deemed in any manner whatever to deprive the trustee or the beneficiaries under this trust of any legal or equitable remedy, by judicial proceedings, consistent with the provisions of these presents, according to the true intent and meaning thereof."    The fair understanding of this is that, if any of the parties to the agreement fail in good faith to carry out the provisions of the deed of trust, those who are liable to suffer injury are free to avail themselves of all of the remedies which courts of equity or of law afford, and, this condition having arrived, the plaintiff in this action is clearly entitled, notwithstanding the contract between the trustee and the mortgagor, to petition the courts for a redress of grievances.

It only remains to consider the question of the jurisdiction of this court.    The plaintiff and the trustee are both residents of this state, and, while the property involved is in the state of Ohio, we see no objection to a court of equity, which acts upon the person, taking jurisdiction in this case.    In the case of Newton v. Bronson, 13 N. Y. 587, the court, after reviewing the authorities, say:

"The cases in the English court of chancery will be found referred to by Chancellor Walworth in the last of these cases. Sutphen v. Fowler, 9 Paige, 280. The doctrine thus established is that this court, having jurisdiction of the person of the defendant, will, by its process of injunction and attachment, compel him to do justice, by the execution of such conveyances and assurances as will affect the title of the property in the jurisdiction within which it is situated."

The same proposition is laid down in the carefully considered case of Gardner v. Ogden, 22 N. Y. 327, where the court say:

"These cases must be held to establish the jurisdiction of the supreme court, in the present case, on an impregnable basis, and that the court, having jurisdiction of the party in whom the legal title to the land in controversy is vested, may, by its process of attachment and injunction, compel him to do justice by the execution of such conveyances and assurances as will affect the title to them in the state of Illinois."

In the case of Earl of Kildare v. Sir Morrice Eustace, 1 Vern. 419, cited with approval by Chief Justice Marshall in the case of Massie v. Watts, 6 Cranch, 148, it was determined that, if the trustee live in England, the chancellor may enforce the trust, although the lands lie in Ireland.

In the recent case of O'Beirne v. Railroad Co., 151 N. Y. 372, 45 N. E. 873, the railroad company was organized under the laws of the state of Pennsylvania, and the title to the property was in the Central Trust Company of New York. The plaintiff was a bondholder, and had requested the trustee to bring an action to compel the performance of certain covenants. This the trustee refused to do, and the action was brought in behalf of the plaintiff and others of his class. The court, at page 383, 151 N. Y., and page 875, 45 N. E., say:

"It appears, and it is so found, that, prior to the commencement of this action, the plaintiff, on behalf of himself and of all bondholders similarly situated, had applied to his trustee, the defendant, the Central Trust Company, and had requested it, for the protection of the bondholders, to institute this suit, and that the trust company had refused to bring this action, or any other suit, for such purpose. In view of this attitude of the trustee, I do not think that there is any doubt but that the plaintiff, as a bondholder of the railroad company, had the right to bring and to maintain the action. If this were not permitted in such cases, bondholders would be wholly without protection. Although the mortgage and its agreements are made to and with the Central Trust Company, as trustee, yet the promise of the railroad company is for the payment of money to the holder of its bonds, and it was to furnish security for the performance of that promise that the mortgage instrument was executed and delivered. The bondholders are the beneficiaries of the mortgage, or deed of trust, and that instrument contains, in effect, a contract made for their benefit through a trustee as a convenient intermediary. It is upon that principle that such an action as this is permitted. Whatever rights were vested in the trustee through the mortgage instrument, as against the mortgagors, inured to the benefit of the bondholder as the beneficiary, and are enforceable by him, in the case of refusal or neglect on the part of his trustee to act for him upon his making the proper request. Although the action was intended to compel the performance by Bullis and Barse of agreements relating to the extent and quality of the lands, which were to constitute part of the security for the payment of the bonds issued by the railroad company, it was not only proper, but necessary, that the railroad corporation should be joined as a defendant. The subject-matter of the suit related to a contract of the railroad company, namely, that which was in the deed of trust concerning the conveyance of lands to the trustee, and the company was, obviously, materially interested in, and

would be affected by, the result of a suit whose object was to cause that security to be furnished which it was contemplated and agreed the bondholders should have. No degree granting relief in the action would be complete unless it operated upon the mortgagor as well as the other parties who are alleged to have become obligated with it."

The question of the jurisdiction of the court was not raised in this case, though much of the property involved, as well as the railroad corporation, was within the jurisdiction of the state of Pennsylvania, and we are persuaded that there was no real question of this kind involved in the case at bar. This court has jurisdiction of the party having the legal title to the property, and of the fiscal agent of the defendant railroad company, and there is no reasonable doubt that it will find a way to make effective any decree which it may issue in the premises.

It is urged, however, that the plaintiff is not entitled to an injunction pendente lite; that he has not shown that the defendant railroad company is insolvent, or that there is any reason to believe that any judgment of the court will not be fully satisfied. In our opinion, it is not necessary that the railroad company should be alleged to be insolvent. The plaintiff has no claim against the railroad company, except as it is related to the net earnings of the property covered by the deed of trust. His lien is upon the net earnings, as determined under the conditions of the mortgage, and it is impossible to determine the amount due him until the amount of the net earnings is ascertained, and, the defendants having put themselves in a situation where they cannot make such determination, the plaintiff is entitled to have the funds of the defendant railroad, in excess of the charges against it enumerated in the mortgage, held in trust until it can be judicially ascertained what portion of the excess is due to him under the terms of the trust deed. "It is manifest," say the court in the case of Thomas v. Railway Co., 139 N. Y. 163, 34 N. E. 877, "that as the bondholders were, by the contract, to receive interest only in case there were earnings of the corporation remaining 'over and above all expenses, including necessary repairs,' any application of the earnings to any purpose other than the purposes embraced within the phrase quoted, before reserving sufficient to pay the interest on the bonds, would constitute a breach of the contract. * * * The security for the payment of interest on the bonds was, at best, precarious, and, although it may be assumed that the price of the bonds in the market was affected by the circumstance, it is but the dictate of obvious justice that such security as was afforded should not be permitted to be impaired by dealings of the corporation with the earnings, not justified by the fair construction of the contract with the bondholders." The suggestion that, the directors of the defendant railroad having failed to determine the amount of the net earnings, the defendant is without remedy, is fully disposed of in the same case, where the court, in reference to a similar provision, say:

"It would be a very unreasonable construction of the contract that the bondholders are concluded by the omission of the board of directors to certify, although there were earnings, in excess of the fair charges against them, applicable to the payment of interest. The wrongful withholding of a certificate when demanded satisfies the condition precedent, and this is

especially true where the alleged condition precedent is some act of the party who is liable to pay. In such case his wrongful inaction is no obstacle to a recovery."

When the parties who are to pay have, by their own acts, placed themselves in a condition where they cannot perform the condition precedent, they are in the same position as though they had wrongfully refused to do the act, and the plaintiff is clearly entitled to a remedy in a court of equity. "We have had occasion to remark more than once that an injunction pendente lite should not be granted unless the court could clearly see it was needed to prevent irreparable injury," say the court in the case of Power v. Village of Athens, 19 Hun, 165; "that is, injury which could not be compensated in damages, or that the injunction itself could do no serious harm to the party enjoined. The merits of the case should be heard at a regular trial."

In the case at bar, the plaintiff, having no claim except upon the net earnings of the property mortgaged, will be in poor condition to realize any benefits from this action, if, before the final determination, all of the net earnings have been distributed among those holding liens junior to his own. On the other hand, it is not apparent that any of the defendants will be seriously incommoded by being denied the right to dissipate this fund. It is conceded that the plaintiff has some rights; that he is entitled to have his interest out of the net earnings of the mortgaged property, and, if this fund has been wrongfully mingled with the earnings of the property of the consolidated companies, this cannot afford any good reason why the plaintiff should be denied his rights, nor does it afford any excuse for using his money for the payment of interest upon other persons' securities. The injunction does not seek to embarrass the railroad company. The plaintiff, as a holder of its securities, is interested in having it operated to the best advantage; but he is unwilling that the property pledged to the security of his investment shall be used to pay interest to others while he is denied any return for his money, and pending an accounting. If, upon the trial of this action, the plaintiff should be found entitled to the relief which he seeks, we are of opinion that the demands of justice require that the defendants shall be denied the right to dissipate the fund which is pledged to the payment of interest on the bonds held by the plaintiff. "An application for a preliminary injunction," say the court in the case of Carleton v. Rugg, 149 Mass. 550, 22 N. E. 55, "rests upon the alleged existence of an emergency, or of a special reason for an order before the case can be regularly heard. It is only to prevent serious injury, for which there is no other complete and adequate remedy, that a court is justified in interfering with the conduct of persons or the use of property before trial. Properly to determine what shall be done in cases of this kind involves an exercise of sound discretion by the presiding judge, who should look to the interests of the petitioners, and of the public whom they represent, and should at the same time remember that without good reason a respondent is not to be dealt with ex parte, nor forced to trial before the case is ripe for hearing." Accepting this rule, and having in mind the contention of the defendant railroad company that

some of the properties making up the consolidated companies are entitled to the earnings of the consolidated property prior to the plaintiff, we are still of opinion that the railroad company, having elected to place itself in a situation where it has mingled the funds of this plaintiff with the earnings of the entire property, has no right to complain of an order which seeks to hold these funds where they may be apportioned according to the spirit of the agreement under which the plaintiff holds his bonds. If this should operate to compel the defendant railroad to pay the maximum rate of 5 per cent. upon the bonds of the plaintiff, we are not able to see that this would result in any great hardship, but rather in the direction of justice. It is the defendant railroad company's own fault if it is embarrassed in this matter. It took the property subject to the pledge of the mortgage, and, if it prefers to save the expense of maintaining separate accounts, it must accept the responsibility of paying the plaintiff his interest, or of reaching some other method of determining the amount due him.

The motion for an injunction pendente lite is granted.